ZACHRY INTERNATIONAL OF PUERTO RICO, INC., peticionaria, *v.* TRIBUNAL SUPERIOR DE PUERTO RICO, SALA DE PONCE, HON. FELIPE ORTIZ ORTIZ, JUEZ, demandado; HON. LUIS F. SILVA RECIO, SECRETARIO DEL TRABAJO, en representación y para beneficio de GLORIA M. ARAUD Y OTRAS, querellante y recurrido.

*Número:* O-74-437 *Resuelto:* 23 de octubre de 1975

268

*Rafael Rodríguez Lebrón,* abogado de la peticionaria; *Benjamín Acevedo Defilló, Angel Alfonso Colón* y *Fernando Román Concepción,* abogados de las querellantes y del Secretario del Trabajo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Como custodios y guardianes máximos de nuestra Constitución nos incumbe considerar el reclamo de inconstitucionalidad invocado por la entidad peticionaria Zachry International of Puerto Rico, Inc., fundado en que las disposiciones contenidas en la Ley Núm. 105 de 6 de junio de 1967 (29 L.P.R.A. sec. 458), (1) relativas a las condiciones del trabajo

---

(1) En lo pertinente dispone:

"Todo patrono fijará en un sitio visible de todo departamento en el cual haya mujeres empleadas o en la oficina de la granja o estancia, en que ellas trabajan, un anuncio impreso expresando el número de horas de trabajo que se exija diariamente a las mujeres durante cada día de la semana, las horas de comenzar y terminar el trabajo, y la hora en que empieza y termina el período destinado a tomar los alimentos; *Disponiéndose, que ninguna mujer trabajará en cada período por más de cuatro (4) horas, a no ser que se les conceda un descanso intermedio de no menos de 20 minutos dentro de cualesquiera de los dos períodos en que se divide su jornada de trabajo, en cuyo caso, con el consentimiento de las trabajadoras y la autoriza-*

durante horas de almuerzo para mujeres obreras, según interpretadas y aplicadas por el Secretario del Trabajo, infringen el precepto constitucional recogido en la Sec. 1 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico—Carta de Derechos—que prohíbe discrimen alguno por motivo de sexo. ([2])

El Tribunal Superior, Sala de Ponce, se negó a desestimar mediante sentencia sumaria la querella incoada contra la peticionaria por el Secretario del Trabajo de Puerto Rico en representación de diez (10) obreras reclamando la suma total de $9,082.30 por trabajo realizado dentro del período para tomar alimentos.

La norma de no pasar juicio sobre planteamientos constitucionales, excepto cuando ello sea necesario, nos obliga a examinar dos aspectos de índole procesal, a saber, la procedencia, como mecanismo, de la sentencia sumaria y la capacidad (*standing*) de la recurrente para impugnar la ley citada por unos fundamentos específicos que correspondería alegar de ordinario, a otras personas.

■ Sobre el primer aspecto, concluimos que la ilustrada sala de instancia erró al no estimar la solicitud de sentencia sumaria como un vehículo procesal adecuado y apropiado. La parte querellante no controvirtió los hechos jurados presentados por la peticionaria en apoyo de su moción, sino que se concretó a formular una oposición sin declaraciones juradas, aduciendo la existencia de controversia por haberse incorporado a la moción de sentencia sumaria la contestación a la querella y haber la querellada negado responsabilidad al

---

ción del Secretario de Trabajo, podrá extenderse por más de cuatro (4) horas, sin que nunca exceda de cinco (5), la duración de dicho período dentro del cual se les concedió el descanso intermedio." (Énfasis suplido.)

([2]) Reza así: "La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la ley. No podrá establecerse discrimen *alguno* por motivo de raza, color, *sexo*, nacimiento, origen o condición social, ni ideas políticas o religiosas. . . ." (Énfasis suplido.)

cumplir ". . . bien y fielmente todas sus responsabilidades como patrono. . . ."[3] Los autos ante nuestra consideración revelan que el producto neto y final sometido con la solicitud de sentencia sumaria constituía un planteamiento estricto de derecho, siendo apropiado que el tribunal a quo lo considerara a través de dicho mecanismo: *Lasanta Piñero* v. *Retto, Inc.*, 100 D.P.R. 694 (1972); *Viuda de Viera* v. *Tribunal Superior*, 93 D.P.R. 503 (1966); *Roth* v. *Lugo*, 87 D.P.R. 386 (1963); *García* v. *Figueroa*, 85 D.P.R. 257 (1962); *Piñeiro* v. *Sucn. A. Cortés*, 83 D.P.R. 685 (1961).

■ El segundo aspecto representa una nueva dimensión a la doctrina expuesta en *E.L.A.* v. *Aguayo*, 80 D.P.R. 552 (1958), en donde resolvimos que nuestra facultad de revisar la constitucionalidad de las leyes sólo ha de ser ejercida dentro de los límites de una controversia real y efectiva entre partes opuestas interesadas en obtener un remedio determinante a sus relaciones jurídicas. Tal dimensión se refiere a la regla general de que un litigante no puede impugnar la constitucionalidad de una ley aduciendo que la misma infringe los derechos constitucionales de terceras personas que no son parte en la acción. Esta regla, corolario de una política de abstención judicial establecida con miras a evitar dictámenes sobre cuestiones constitucionales que resultan académicas o en abstracto, ha sido objeto de previa interpretación y prevalece en la jurisdicción federal. Sin embargo, como excepción a la misma y cuando concurren ciertas circunstancias, se ha reconocido a un litigante la facultad de reclamar los derechos constitucionales de terceros.

---

[3] En su Alegato el querellante reitera tal posición y plantea unas interrogantes de hechos a su juicio concluyentes y esenciales, demostrativas de la corrección del dictamen del tribunal de instancia. No podemos coincidir con dicho enfoque, pues nuestro análisis refleja que la única cuestión planteada en virtud de la solicitud de sentencia sumaria era la constitucionalidad de la ley; aspecto puro de derecho cuya solución no exigía el entrar en tales interrogantes de hechos.

A nivel del Tribunal Supremo federal, los casos normativos más sobresalientes son *Tileston* v. *Ullman*, 318 U.S. 44 (1943); *Barrows* v. *Jackson*, 346 U.S. 249 (1953); y *N.A.A.C.P.* v. *Alabama, ex rel. Patterson*, 357 U.S. 449 (1958).[4]

■ Estos casos reflejan los factores y criterios esenciales que justifican el reconocimiento de capacidad jurídica (*standing*) a un litigante para cuestionar la constitucionalidad de una ley o de una actuación administrativa al amparo de los derechos de terceras personas. Un distinguido estudioso del derecho constitucional federal, a comienzos de la década de 1960, resumía tales factores del siguiente modo:

"Existen cuatro factores que el Tribunal toma en cuenta al determinar la capacidad para invocar los derechos de otros: (1) el interés del litigante; (2) la naturaleza del derecho invocado; (3) la relación existente entre el litigante y las terceras personas; y (4) la factibilidad de que los terceros puedan hacer valer tales derechos en una acción independiente y . . . [u]na decisión concediendo o negando capacidad en un caso en particular dependerá de la existencia o no de tales factores." Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court*, 71 Yale L.J. 599, 627 (1962). (Traducción nuestra.)

---

[4] En el primero se negó capacidad jurídica (*standing*) a un médico para atacar la constitucionalidad de una ley que prohibía la distribución de material informativo y el uso de contraceptivos, bajo la alegación de que ello ponía en peligro la vida de sus pacientes. El Tribunal entendió que los pacientes eran las personas apropiadas para hacer dicho planteamiento y no el médico, quien no alegaba que la ley constituía un impedimento al libre ejercicio de su profesión. En *Barrows*, supra, se le permitió a una persona de la raza blanca, demandada en un pleito por incumplimiento de contrato, presentar en su defensa el efecto discriminatorio del contrato sobre las personas de la raza negra; y en *N.A.A.C.P.*, supra, se le concedió la oportunidad a una organización de defender el derecho de terceras personas a no revelar su afiliación con dicha entidad. En estos dos últimos casos, los litigantes tenían un interés propio, esto es, eran afectados personalmente. En el primero, Jackson se exponía a ser condenado en daños por el incumplimiento de contrato y en el segundo, la N.A.A.C.P. estaba sujeta a una pérdida en su matrícula y una merma en sus finanzas.

La doctrina ha continuado bajo análisis en situaciones en que el interés del litigante([5]) es manifiesta. Si bien existe una tendencia de tratar con menos rigurosidad los requisitos sobre capacidad jurídica (*standing*) en general,([6]) la doctrina respecto a la oportunidad de plantear derechos de terceros permanece en una zona de penumbra, producto de la fluctuación entre los casos extremos de *Tileston,* supra, y *Barrows,* supra. No obstante, el principio rector es que el tribunal ejercitará su discreción en uno u otro sentido, dependiendo de la trascendencia del derecho afectado y la importancia de los intereses en conflicto.

Los últimos pronunciamientos sobre la doctrina que destacan la importancia de los factores a ser considerados, están comprendidos en los casos de *Warth* v. *Seldin,* 45 L.Ed.2d 343, a las págs. 354–356 (1975) ; *Moose Lodge No. 107* v. *Irvis,* 407 U.S. 163, a la pág. 166 (1972) ; *Eisenstadt* v. *Baird,* 405 U.S. 438, a las págs. 443–446 (1972). En *Eisenstadt,* supra, se le permitió al apelante abogar por el derecho de las personas solteras a tener acceso a contraceptivos. El Tribunal manifestó:

"De cualquier modo, más importante que la naturaleza de la relación existente entre el litigante y aquellos cuyos derechos intenta hacer valer es el impacto de la litigación en los intereses de los terceros." Pág. 445. (Traducción nuestra.)

En *Moose Lodge No. 107,* supra, se atacó la política discriminatoria de una fraternidad privada, que poseía una licen-

---

([5]) Así, en *Peters* v. *Kiff,* 407 U.S. 493 (1972), se le reconoció capacidad jurídica (*standing*) a una persona de la raza blanca para cuestionar la exclusión de personas de la raza negra del jurado que le condenó, a pesar de que él no formaba parte de la clase excluida. Asimismo, en *Taylor* v. *Louisiana,* 42 L.Ed.2d 690 (1975) se permitió a un hombre atacar la exclusión de mujeres del jurado que le juzgó, aunque el apelante tampoco formaba parte del grupo excluido. Véase además, *Trafficante* v. *Metropolitan Life Insurance,* 409 U.S. 205 (1972).

([6]) Sobre capacidad jurídica (*standing*) en general, véanse: *United States* v. *Richardson,* 418 U.S. 166 (1974); y *Schlesinger* v. *Reservists Comm. to Stop the War,* 418 U.S. 208 (1974).

cia estatal, bajo el fundamento de no atender, servir y aceptar como miembros a personas de la raza negra. El Tribunal, no obstante reconocer la capacidad del peticionario (persona de dicha raza) para cuestionar los dos primeros extremos, en cuanto al último resuelve lo siguiente:

"Si bien esta Corte ha decidido que en situaciones excepcionales una parte agraviada puede descansar en los derechos constitucionales de terceras personas para la obtención de remedio, *Barrows* v. *Jackson*, 346 U.S. 249 (1953), en este caso el demandado no fue agraviado por la política de socios de Moose Lodge pues nunca gestionó su ingreso." Pág. 166. (Traducción nuestra.) Véase *United States* v. *SCRAP*, 412 U.S. 669 (1973).

En el caso de *Warth*, supra, se alegaba que una ordenanza municipal tenía el efecto de discriminar contra las personas pobres, de ingresos moderados, y pertenecientes a grupos raciales o étnicos minoritarios, al ponérseles obstáculos para la construcción de viviendas de bajo costo. El Tribunal hace una recopilación de la doctrina de capacidad jurídica (*standing*), con especial énfasis en el problema de los derechos de terceros, y concluye que los peticionarios—quienes acudieron a la corte en calidad de personas de ingresos bajos y moderados y como miembros de grupos raciales o étnicos minoritarios atacando la constitucionalidad de la ordenanza—carecían de capacidad para demandar. Sobre la cuestión que nos ocupa se señala nuevamente:

"En algunas circunstancias, las consideraciones contrapuestas pesan más que las preocupaciones usuales subyacentes de ejercitar el poder judicial cuando el remedio reclamado descansa en los derechos legales de terceros. . . . En tales ocasiones, la corte ha encontrado, en efecto, que la disposición constitucional o estatutaria envuelta conlleva una causa de acción en favor del demandante." Pág. 356. (Traducción nuestra.)

Estamos convencidos de que debemos incorporar a nuestro acervo jurisprudencial las normas y factores informados en la doctrina expuesta por ser las mismas compatibles con las nor-

mas expuestas en *E.L.A.* v. *Aguayo*, supra, y estar acordes con la misión constitucional de este tribunal en la estructura de Gobierno prevaleciente. No obstante, por constituir una norma de excepción al método de adjudicar hasta ahora seguido por este Tribunal con respecto a cuestiones constitucionales, las situaciones en que se invoque esta norma han de satisfacer con la más rigurosa exigencia los cuatro elementos o factores determinantes de capacidad que antes hemos apuntado.

Aplicada la doctrina al caso de autos, resolvemos que concurren los factores necesarios para que reconozcamos capacidad jurídica a la peticionaria para reclamar la inconstitucionalidad de la ley que nos ocupa. A tal efecto, ésta no sólo tiene capacidad para demandar, sino que habiendo sido demandada, está expuesta a la contingencia real de ser condenada a una sentencia de $9,082.30; invoca la protección de derechos de preeminencia en la jerarquía constitucional puertorriqueña; si bien entre la peticionaria y los querellantes existe una relación de patrono y empleado, se reclaman derechos que de ser reconocidos, trascienden la simple existencia de dicho vínculo; y aun cuando los tribunales están disponibles para que se plantee la inconstitucionalidad de la ley, resulta dudoso que aquellas obreras que se están beneficiando de la misma acudan a impugnarla, a la par que es difícil que una mujer desempleada pueda establecer el nexo entre su condición de desempleo y la ley que nos ocupa.

Estos factores, unidos al interés público que reviste la cuestión, inclinan favorablemente la balanza respecto a la capacidad de la peticionaria para invocar y plantear la inconstitucionalidad de la ley.

Superados estos extremos, pasemos a considerar la médula del recurso. La disposición de la ley que nos ocupa provee que ninguna mujer trabajará en cada período de trabajo diario anterior y posterior al destinado para tomar alimentos, más de cuatro (4) horas, a no ser que se le conceda un descanso intermedio no menor de veinte (20) minutos dentro de cualquiera

de los dos períodos en que se divide su jornada de trabajo, de lo contrario deberá compensársele a razón de tiempo doble por las horas trabajadas correspondientes a la quinta (5ta.) hora de trabajo. [7]

Ante dicha disposición legal, las posiciones de las partes se pueden resumir del siguiente modo:

La peticionaria señala que dicho beneficio no se provee para empleados varones, y argumenta que ello constituye un discrimen por razón de sexo, y además, una violación al Título 7 de la Ley de Derechos Civiles Federal (42 U.S.C.A. sec. 2000 *et seq.*) por discriminar contra las empleadas mujeres al imponerles prohibiciones y limitaciones en cuanto a la capacidad para trabajar más de cuatro (4) horas consecutivas en cualquiera de los dos períodos de la jornada diaria de trabajo; restricciones y prohibiciones que no se imponen respecto a la contratación y empleo de trabajadores varones. En contrario, la parte querellante aduce que la ley exigiendo el requisito de veinte (20) minutos de descanso es posterior a la Ley Federal de Derechos Civiles de 1964, infiriendo de ello un ejercicio consciente del poder policial del Estado para plasmar en política pública ". . . su preocupación por proteger la frágil naturaleza femenina de los riesgos inherentes a las jornadas prolongadas o interminables de trabajo." Para robustecer su tésis de que la ley no discrimina contra la mujer acompaña estadísticas ilustrativas de que en la última década ésta ha aumentado su participación en el empleo del sector manufacturero de nuestra economía de 46.6% (por ciento) en el año 1965 a un 48% (por ciento) en 1974.

 Es menester una breve exégesis sobre la cláusula constitucional de la igual protección de las leyes. Las normas

---

[7] En virtud de la Ley Núm. 105 de 6 de junio de 1967 se dispuso la concesión del descanso intermedio no menor de 20 minutos y se reguló específicamente el tiempo para tomar alimentos. El historial legislativo, aunque escaso, demuestra que se rechazó en dicha ocasión una enmienda tendente a eliminar la prohibición referente a cuatro (4) horas optándose por el descanso intermedio. 21 *Diario de Sesiones*, pág. 1004 (1967).

que nutren este principio constitucional no exigen un trato igual para todos los ciudadanos, pero prohíben un trato desigual injustificado. El Estado puede hacer clasificaciones entre las personas sin infringir dicho principio siempre y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés público legítimo. (⁸) El problema consiste en dictaminar cuando la clasificación es razonable o no.

■ Para analizar la clasificación, se han elaborado, básicamente, dos criterios: el primero, conocido frecuentemente como análisis tradicional (*"traditional" equal protection analysis*), dispone que una clasificación legislativa no debe ser invalidada a menos que sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y un interés legítimo del Estado. Bajo esta fórmula, se ha interpretado que es constitucional una ley siempre que pueda concebirse razonablemente una situación de hechos que justifique la clasificación.

■ Evidentemente, este criterio o medida (*standard*) coloca el peso de la prueba en aquel que alega la inconstitucionalidad de la legislación en controversia.

■ El segundo criterio, de génesis más reciente y como reacción a la insatisfacción generada por el primero, establece que cuando la clasificación afecta derechos fundamentales del ciudadano y va dirigida contra una clasificación sospechosa, (⁹) la misma estará sujeta a un estricto escrutinio judicial. (¹⁰) En este caso, corresponde al Estado demostrar la existencia de

---

(⁸) *Legislative Purpose, Rationality, and Equal Protection,* 82 Yale L.J. 123, a las págs. 138–141 (1972).

(⁹) Se denominan clasificaciones sospechosas porque frecuentemente la característica en que se basa la clasificación no guarda relación con la habilidad o aptitud de las personas afectadas por la clasificación. Véase *Sailer Inn, Inc.* v. *Kirby,* 485 P.2d 529, 540–541 (1971) donde el Tribunal Supremo de California declara sospechosas las clasificaciones a base de sexo, siendo el primer Tribunal Supremo estatal en así hacerlo. Consúltese además, 46 N.Y.U. L. Rev., 675, 738–739 (1971) y 37 Calif. L. Rev., 341 (1949).

(¹⁰) 82 Yale L.J. 123, a las págs. 146–149.

un interés público apremiante o de superior jerarquía (*compelling state interest*) que justifique la clasificación y que la misma promueva necesariamente la consecución de ese interés. Este criterio ha sido aplicado a ciertas leyes que establecen distinciones sospechosas, como las basadas en la raza, nacionalidad, ciudadanía, pobreza o nacimiento. ([11])

■ ¿Deben considerarse las distinciones por razón de sexo como clasificaciones inherentemente sospechosas, y por ende, sujetas a una rigurosa revisión judicial en materia de cuestiones constitucionales?

En la jurisdicción federal el Tribunal Supremo se enfrentó directamente con este planteamiento en el caso de *Frontiero* v. *Richardson*, 411 U.S. 677 (1973) habiendo resuelto una pluralidad de sus miembros que "clasificaciones basadas en sexo, al igual que clasificaciones basadas en raza, ciudadanía u origen nacional, son inherentemente sospechosas y por lo tanto están sujetas a un estricto escrutinio judicial." ([12]) Pág. 688. (Traducción nuestra.)

---

([11]) *Brown* v. *Board of Education*, 347 U.S. 483 (1954); *McLaughlin* v. *Florida*, 379 U.S. 184 (1964); *Oyoma* v. *California*, 332 U.S. 633, 644, 646 (1947); *Griffin* v. *Illinois*, 351 U.S. 12 (1955).

([12]) El Tribunal se aparta en este caso de su trayectoria jurídica, ante alegaciones de discrimen por razón de sexo, de su análisis tradicional de la igual protección de las leyes, del cual los casos de *Goesaert* v. *Cleary*, 335 U.S. 464 (1948) y *Hoyt* v. *Florida*, 368 U.S. 57 (1961), son representativos.

El tránsito del análisis tradicional, al análisis estricto fue precedido por el caso de *Reed* v. *Reed*, 404 U.S. 71 (1973), en el cual se vislumbra tenuemente una novel actitud judicial hacia el problema de discrimen por razón de sexo, en comparación con la actitud que se traslucía de los casos de *Goesaert*, supra y *Hoyt*, supra.

El valor precedencial de *Frontiero*, supra, es incierto por no contar con una firme y absoluta mayoría del Tribunal, según se desprende de decisiones posteriores en las cuales no ha logrado imponerse la doctrina de que las clasificaciones a base de sexo son inherentemente sospechosas y por tanto sujetas a un estricto escrutinio judicial. Véanse: *Kahn* v. *Shevin*, 416 U.S. 351 (1974); *Geduldig* v. *Aiello*, 417 U.S. 484 (1974); *Schlesinger* v. *Ballard*, 42 L.Ed.2d 610 (1975); *Weinberger* v. *Wiesenfeld*, 43 L.Ed.2d 514 (1975); *Stanton* v. *Stanton*, 43 L.Ed.2d 688 (1975).

En Puerto Rico, nuestra Constitución no sólo garantiza la igual protección de las leyes en su Art. II, Sec. 7, sino que, contrario a la federal, prohíbe *expresamente* en su Art. II, Sec. 1, el discrimen por razón de sexo. En consecuencia, al confrontarnos con la dicotomía que representa la crítica determinación de cuál fórmula analítica aplicar a los casos por razón de sexo, nos inclinamos en favor—debido a la interacción de los valores contenidos en nuestra Ley Fundamental en contra del discrimen por razón de sexo y la igual protección de las leyes—de la fórmula de estricta supervisión judicial.

En tal sentido nos habíamos pronunciado en el caso de *Wackenhut Corp.* v. *Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972):

"... hay áreas en las cuales, por su tangencia con la dignidad humana y con el principio de que todo el mundo es igual ante la ley, toda clasificación es inherentemente sospechosa y está sujeta al más minucioso examen judicial. Estas áreas incluyen las clasificaciones o discrímenes por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad."

██ Admitimos no obstante, que la Constitución reconoce, al igual que la propia naturaleza, diferencias por razón de sexo y permite las mismas si éstas no discriminan.[13] En virtud de sus diversas disposiciones y su aplicación a distintas áreas, no pueden extenderse prohibiciones absolutas que impidan el ejercicio legítimo del poder de reglamentación del Estado para aprobar medidas razonables con el objetivo de salvaguardar el interés común. Una pieza legislativa debe sostenerse o anularse en orden a la dimensión, sustancialidad y realidad de los principios comunitarios e individuales envueltos y los problemas sociales que intenta corregir.

---

[13] Véase *Ponce Candy Industries* v. *Corte*, 69 D.P.R. 417 (1948) en el cual reconocimos la maternidad como base para conceder unos derechos específicos.

En su perspectiva histórica, la disposición de ley que nos ocupa, data del año 1919 y está inspirada en la noción de un paternalismo romántico del Estado hacia la mujer, en una época en que no existía en Puerto Rico un andamiaje legal y organizacional como el presente capaz de garantizar al obrero, independientemente de su sexo, unas condiciones mínimas de trabajo respecto a seguridad, jornada legal, salario y otros.

Desde entonces y hasta el presente resulta evidente la creciente incorporación de la mujer en las diversas fases de la actividad económica desplegada por nuestro pueblo poniendo en entredicho su clásica función que gira sobre el hogar. [14] Ello constituye un esfuerzo legítimo de la mujer tendente a alcanzar mejores oportunidades de autoexpresión, reconocimiento personal y de sostén para sí y su familia.

Una de las consecuencias del fenómeno de la movilidad femenina hacia el trabajo económicamente productivo, resulta ser el examen de las llamadas leyes en protección de las obreras con el objetivo de determinar si las mismas en su expresión o implementación pueden subsistir ante el mandato de linaje constitucional que proclama como odioso el discrimen basado en sexo, cuyo ". . . propósito es reconocer el advenimiento de la mujer a la plenitud del derecho y a la igualdad de oportunidades con el hombre." [15] Ante tal pronunciamiento en nuestra Ley Fundamental no es necesario encontrar apoyo en la legislación y jurisprudencia federal sobre derechos civiles, pues nuestra Carta de Derechos es lo

---

[14] Hace más de un siglo el Juez Bradley del Tribunal Supremo Federal expresó en opinión concurrente:

"El hombre es o debe ser, el protector y defensor de la mujer. La timidez y delicadeza natural perteneciente al sexo femenino evidentemente la incapacita para muchos trabajos en la vida civil. La constitución de la organización familiar que está fundada en mandato divino, al igual que en la naturaleza de las cosas, señala hacia la esfera doméstica como la función y dominio propio a que pertenece la mujer." *Bradwell* v. *The State*, 83 U.S. 130, 141 (1872). (Traducción nuestra.)

[15] 4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, pág. 2561 (Ed. 1961).

suficientemente amplia para cubrir a satisfacción la situación ante nuestra consideración. (¹⁶)

Al condenar el discrimen por motivo de raza, color, sexo, nacimiento, origen social, ideas políticas o religiosas, nuestra Constitución reconoce un sistema jurídico humanitario que postula la dignidad del ser humano, su inviolabilidad e igualdad ante la ley. Con ello se intentan superar y sobrepasar los accidentes circunstanciales que tengan origen en la naturaleza o en la cultura. Es evidente que el sexo, al igual que la raza, constituyen rasgos que surgen en el ser humano por un simple hecho fortuito: el nacimiento; éste nada tiene que ver con la habilidad de la persona de oportunamente aportar y contribuir a los esfuerzos legítimos de una sociedad. Es por ello que nos reafirmamos en que ante este foro

---

(¹⁶) En Puerto Rico: *Informe Comité Laboral sometido al Consejo sobre la Reforma de la Justicia en Puerto Rico*, págs. 26–34 (1974); Heber Lugo, *Sex Discrimination: The Equal Pay Act of 1963, title VII of the Civil Rights Act of 1964 and Puerto Rico*, 32 Rev. C. Abo. P.R., págs. 215–222 (1971); Ramírez Lavandero y Ortiz Carrión, *El Desarrollo de una Fórmula Intermedia en la aplicación de la Igual Protección de las Leyes a la Discriminación por Razón de Sexo: Reed v. Reed*, XLII Núm. 3 Rev. Jur. U.P.R., págs. 425–454 (1973); Comisión de Derechos Civiles, *La igualdad de Derechos y Oportunidades de la Mujer Puertorriqueña*, págs. 49–73 (1973). Como jurisprudencia ilustrativa de la Corte de Distrito Federal local véase *Doctor's Hospital, Inc. v. Recio*, 383 F.Supp. 409 (1974).

En los Estados Unidos, la literatura sobre este asunto es abundante e ilustra la tendencia de imprimirle mayor validez y contenido al papel que desempeña la mujer. Consúltese: Duke L.J., *The Emerging Bifurcated Standard for Classifications Based on Sex*, págs. 163–187 (1975); Vol. 418 Annals, *The Liberation of Women in a Full Employment Society*, 138–146 (March 1975); Vol. XX No. 2 N.Y.L.F., *Recent Developments in the Area of Sex-Based Discrimination—The Courts, The Congress, and the Constitution*, págs. 359–380 (1974); Vol. 48, No. 3 Tul. L. Rev., *Constitutional Law —Sex Discrimination—Supreme Court Plurality Declares Sex a Suspect Classification*, págs. 710–720 (1974); 23 Baylor L. Rev., *Sex Discrimination in Employment*, págs. 665–672 (1971); 46 N.Y.U. L. Rev., *Sex Discrimination by Law; A Study in Judicial Perspective*, págs. 675–747 (1971); No. 2 Harvard Civil Rights—Civil Liberties L. Rev., *Equal Rights for Women: A Symposium on the Proposed Constitutional Amendment*, págs. 215–287 (1970–71); 42 So. Cal. L. Rev., *A Woman's Place: Diminishing Justifications for Sex Discrimination in Employment*, págs. 183–211 (1968–69).

judicial, una diferencia basada en el sexo resulta una clasificación sospechosa, en particular cuando la misma tiende a relegar a un estado legal de inferioridad a una clase con abstracción de las potencialidades y características individuales de sus miembros.

Teniendo en cuenta el trasfondo de principios expuestos, no es necesario un esfuerzo exhaustivo mental para concluir que la disposición de la ley que nos ocupa niega a la mujer igual oportunidad de trabajo con referencia al hombre, pues representa para el patrono el atractivo de seleccionar a un obrero varón a quien le puede exigir, sin ninguna limitación, la prestación de sus servicios hasta cinco (5) horas ininterrumpidas sin necesidad de tiempo intermedio de descanso o paga adicional. Con ello se cierran parcialmente las puertas a la mujer obrera en el desempeño de igual trabajo pues el patrono obviamente, en igualdad de preparación y experiencia, optará por reclutar al varón obrero y rechazar a la mujer obrera. No puede argumentarse válidamente una proposición basada en la debilidad femenina cuando el estatuto reconoce la habilidad de la mujer para trabajar las cinco (5) horas si tiene meramente un descanso de veinte (20) minutos. La razón aducida por el Estado al establecer la referida clasificación en orden a "su preocupación por proteger la frágil naturaleza femenina de los riesgos inherentes a las jornadas prolongadas o interminables de trabajo" constituye una conclusión contra las potencialidades de la fuerza obrera femenina del país. Se nutre de algunas premisas subjetivas erróneas, tradicionales y estereotipadas que emanan de una visión masculina que—consciente o inconscientemente—tiene su razón de ser en la concepción y caracterización de la mujer como "sexo débil". El pedestal en que se intenta situar a la mujer en este enfoque tradicional y paternalista puede resultar a veces en una jaula para aprisionarla, incompatible con sus derechos legítimos.

■ Igualmente, la disposición de ley enerva la eficacia del derecho de todo trabajador ". . . a recibir igual paga por igual trabajo . . ." contenida en la Sec. 16 de nuestra Carta de Derechos, pues fundada en sexo, distingue y establece una clasificación o jornal de salario doble no reconocido al varón obrero.

"El principio de igual paga por igual trabajo interesa evitar discrímenes de una parte e irritaciones de otra, producidas cuando la compensación diferente carece de justificación frente a la igualdad de la labor rendida." 4 *Diario de Sesiones de la Convención Constituyente*, pág. 2574 (Ed. 1961).

Intentó en la conciencia de la Asamblea Constituyente que a la mujer no se le pagara menos que al hombre por la misma labor. Siendo ello así, no podemos sostener un razonamiento que a la inversa crea un discrimen contra el varón obrero y permite una desigualdad injustificada.

En resumen, resulta discriminatorio e inconstitucional el precepto de ley específico que nos ocupa en dos modalidades: una en cuanto a la capacidad de empleo de la mujer y otra en cuanto a la capacidad del hombre para devengar igual paga por igual trabajo.

No menospreciemos la visión puertorriqueña fundada en nuestra cultura hispana de que la mujer constituye el alma en que gira nuestra vida familiar y hogareña, al apartarnos de los moldes rigurosos del pasado y darle cabida a las aspiraciones legítimas que el presente les impone. Ello no debe sorprender a nadie, pues con anterioridad habíamos resuelto que la tradición familiar no puede oponerse para sostener un discrimen por razón de sexo. *González* v. *Tribunal Superior*, 97 D.P.R. 804, 808 (1969). Hace unas décadas a la mujer se le negó el derecho al voto electoral, hasta que una generación rompió algunos de los eslabones de las cadenas que simbólicamente restringían tal derecho y reconocieron el sufragio universal; a la generación actual, con hidalguía jurídica, corresponde quebrar los eslabones que

aún subsisten e impiden el reconocimiento pleno de los derechos de la mujer.

En vista de que en la querella se invoca la Ley Núm. 379 del 15 de mayo de 1948, según enmendada, y que la solicitud de sentencia sumaria giró en torno a la validez de la disposición de la Ley Núm. 105 de 6 de junio de 1967—enmendatoria de la número 73 de 21 de junio de 1919—*se dictará Sentencia Sumaria Parcial declarando inconstitucional la disposición de la Ley Núm. 105 con relación a la limitación referente al descanso después de las cuatro (4) horas de trabajo, devolviéndose el caso al tribunal de instancia para que determine, previa oportunidad a las partes, si subsiste fundamento por lo cual no deba desestimarse totalmente la querella.*

El Juez Asociado, Señor Rigau, concurre en el resultado.