LUIS ANTONIO VÁZQUEZ NEGRÓN, por sí y en representación de su esposa YOLANDA ORTIZ CARTAGENA y de sus hijos menores; LUIS ANTONIO y JUAN LUIS, éstos de apellidos VÁZQUEZ ORTIZ, ETC., ET AL., demandantes y recurrentes, *v.* EL DEPARTAMENTO DE SALUD DEL E.L.A. DE P.R., ADMINISTRACIÓN DEL FONDO DE COMPENSACIÓN AL PACIENTE; DR. ALFONSO SERRANO VÁZQUEZ, ETC., ET AL., demandados y recurridos.

*Número:* R-78-85       *Resuelto:* 29 de junio de 1979

*Samuel Gracia Gracia*, abogado de los recurrentes; *Dubón González & Berríos* y *Gilberto Gierbolini, Hijo*, abogados del Dr. Alfonso Serrano Vázquez; *Roberto Armstrong, Hijo, Procurador General Interino*, y *Federico Cedó Alzamora*, abogados del Estado Libre Asociado de Puerto Rico.

EL JUEZ ASOCIADO SEÑOR MARTÍN emitió la opinión del Tribunal.

La cuestión planteada en este caso es si un médico que trabaja para el Estado Libre Asociado de Puerto Rico en el Hospital Subregional de Caguas en donde rendía una tarea regular como ginecólogo y obstetra mediante compensación anual de $19,260 está exento de ser demandado por daños ocasionados por culpa o negligencia en el cumplimiento de sus deberes y funciones profesionales médicas como empleado del Estado, por razón de que ejercía además la práctica privada de la que derivaba salarios ascendentes a $16,000 anuales de un centro obstétrico ginecológico y en adición prestaba servicios médicos en un hospital privado.

La alegada culpa o negligencia del referido médico ocurre en las siguientes circunstancias. Allá para el 25 de enero de 1977, el demandado Dr. Alfonso Serrano Vázquez le practicó a la codemandante Yolanda Ortiz Cartagena una laparoscopía diagnóstica bajo anestesia general. Los demandantes, que resultan ser el esposo, los hijos menores, los padres y los hermanos de la paciente, alegan que como resultado de la negligencia, descuido, falta de circunspección e impericia del Dr. Serrano al llevar a cabo dicha intervención quirúrgica, la paciente Yolanda Ortiz Cartagena sufrió una hipoxia

encefalopática([1]) que le causó daños permanentes en el cerebro, daños que la mantienen en estado cuasi vegetal. A base de sus alegaciones los demandantes han entablado la presente reclamación de compensación por los daños y perjuicios sufridos, dirigida, entre otros, contra el Dr. Serrano Vázquez y contra la compañía de seguros que cubre su responsabilidad profesional.

El Dr. Serrano solicitó sentencia sumaria parcial, en la que sostiene que el daño alegado surgió mientras actuaba en el cumplimiento de sus deberes y funciones como empleado de carácter regular del Hospital Subregional de Caguas, y por tanto no puede ser incluido como parte demandada en una reclamación de daños y perjuicios por así disponerlo el Art. 41.080 de la Ley Núm. 74 de 30 de mayo de 1976, 26 L.P.R.A. secs. 4101, 4108. Los demandantes, así como el Estado Libre Asociado, oportunamente se opusieron a dicha moción. No obstante, la sentencia sumaria solicitada por el Dr. Serrano fue declarada con lugar en 6 de febrero de 1978. Al así proceder, la ilustrada sala de instancia incidió.

Veamos el trasfondo legal del problema. En 1976 la Asamblea Legislativa tuvo que enfrentarse "al problema de encarecimiento, escasez y pérdida" del seguro de responsabilidad profesional para médicos e instituciones hospitalarias, y por tanto a los "aumentos en los costos de los servicios de salud y serias limitaciones al ejercicio cabal y pleno de la medicina", lo que tenía consecuencias adversas "para la salud, el bienestar y la estabilidad del pueblo en general." Véase Exposición de Motivos, Ley Núm. 55 de 18 de julio de 1978 (refiriéndose a la Ley Núm. 74 de 30 de mayo de 1976).

La situación había comenzado a deteriorarse desde el 1974. En marzo de 1975 alcanzó un punto crítico cuando la compañía que aseguraba el 52% del total de médicos asegurados canceló masivamente sus pólizas. *Memorando explicativo del Comisionado de Seguros de Puerto Rico en relación con el P.*

---

([1])La hipoxia encefalopática es condición que describe la falta de oxígeno en los tejidos del cerebro.

*del S. 1788.* En 30 de mayo de 1976 se aprobó la Ley Núm. 74 que creó un elaborado esquema reglamentando el seguro de responsabilidad profesional médico–hospitalaria. 26 L.P.R.A. sec. 4101 *et seq.*

En 1978 el legislador advirtió que la situación que se intentó controlar dos años antes mediante la Ley Núm. 74 de 1976 se tornó aún más crítica, pues solamente dos compañías de seguros estaban vendiendo pólizas de responsabilidad profesional. Las primas habían continuado en aumento y las condiciones bajo las que se expedían las pólizas ofrecían poca protección a los profesionales y hospitales. Véase Exposición de Motivos, Ley Núm. 55 de 18 de julio de 1978, *supra.*[2]

Toda vez que los hechos objeto del caso de autos ocurrieron durante la vigencia de la Ley Núm. 74 de 1976 le daremos más énfasis a dicha pieza legislativa, pero a los fines de que los planteamientos puedan considerarse en su justa perspectiva señalaremos las diferencias más relevantes y aquí pertinentes, que surgen de las modificaciones habidas posteriormente mediante la Ley Núm. 55 de 1978, *supra.*

Debemos recordar a este punto que en el análisis estatutario la tarea fundamental es buscar la intención del legislador. Lo importante es lo que él ha querido decir independientemente de la forma que haya escogido para decirlo. *Municipio v. Fernós, Com.,* 63 D.P.R. 978, 983 (1944). Según dijimos en *Sucn. Giusti v. Tribl. Contribuciones,* 70 D.P.R. 117, 136 (1949), "las ideas son prisioneras del lenguaje que las expone."

La Ley Núm. 74 de 1976 requería que "todo profesional en el cuidado de salud y/o institución para el cuidado de salud [radicara] ante la Administración [del Fondo de Compensación

---

[2]Conveniente es señalar que el problema que representa la escasez de seguros de responsabilidad profesional médica, no es exclusivo de nuestro país. En los Estados Unidos, por ejemplo, el problema ha sido motivo de grave preocupación en los últimos años. R. E. Keeton, *Compensation for Medical Accidents,* 121 U. Pa. L. Rev. 590, 595 (1973). Prontamente reaccionaron las legislaturas estatales y para el 1ro de enero de 1977 ya cuarentiún estados había adoptado legislación o enmendado la existente con ánimo de solucionar el problema. W. E. Knepper, *Review of 1976 Tort Trends,* 26 Def. L.J. 1 (1977).

al Paciente] prueba de su responsabilidad financiera" por ciertas sumas allí indicadas. Art. 41.080, 26 L.P.R.A. sec. 4108. Eximía de dicha obligación a "aquellos profesionales en el cuidado de salud que *exclusivamente* prestan sus servicios para el Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios y aquellas instituciones para el cuidado de salud que pertenezcan al Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios." (Énfasis suplido.) *Id.* En adición, protegía a dichos profesionales que trabajaran *exclusivamente* para el Estado, etc., de ser demandados por "daños por culpa o negligencia que [causaran] en el desempeño de su profesión mientras [actuaran] en cumplimiento de sus deberes y funciones como empleado[s] del Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios." *Id.*

La enmienda de 1978 al citado Art. 41.080 excluyó de la obligación de someter prueba de responsabilidad financiera, entre otros, a aquellos profesionales ". . . que *exclusivamente* trabajan para el Estado Libre Asociado de Puerto Rico, sus dependencias, instrumentalidades y municipios *y que no ejercen privadamente su profesión* . . . ." Ley Núm. 55 de 1978, *supra*. Extendió además la exclusión como demandado por culpa o negligencia en el desempeño de su profesión ". . . mientras dicho profesional en el cuidado de salud actúa en cumplimiento de sus deberes y funciones como empleado del Estado. . . ."

En otras palabras, el Art. 41.080 desde 1978 dispensa a los profesionales médicos que *exclusivamente prestan* sus servicios al Estado, etc., de cumplir con la obligación de presentar prueba de responsabilidad financiera, y a la vez dispensa a los médicos de ser demandados por culpa o negligencia si al surgir el accidente actuaban en el desempeño de su profesión como funcionarios o empleados del Estado, sin más cualificaciones.

La realidad, sin embargo, es que en 1976 el Art. 41.080

24

extendía la protección contra demandas sólo al profesional que trabajara *"exclusivamente"* para el Estado Libre Asociado o sus dependencias.

■ El término "exclusivamente" quiere decir "con exclusión; sola, únicamente." Real Academia Española, *Diccionario de la Lengua Española*, Madrid, 1970, pág. 595.(³) Así lo interpretamos en *Cámara de Comercio* v. *Tribl. de Contribuciones*, 67 D.P.R. 427, 430–431 (1947), obedeciendo al mandato del Código Civil según dispone que "las palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación. . . ." 31 L.P.R.A. sec. 15. Ver *Lange* v. *El Pueblo*, 24 D.P.R. 854, 857 (1917). Mas, no obstante, en *Srio. del Trabajo* v. *Asoc. de Señoras Damas*, 94 D.P.R. 137, 147 (1967), al analizar un estatuto de seguridad de empleo, identificamos un claro lenguaje estatutario, un preciso historial legislativo, y varios precedentes persuasivos que nos condujeron a adoptar otra interpretación para el adverbio "exclusivamente". La Ley que allí interpretábamos— Ley de Seguridad de Empleo—disponía expresamente que sus disposiciones serían "liberalmente interpretadas para cumplir su propósito de promover la seguridad de empleos . . . ." Por eso resolvimos que en el contexto de una de sus secciones la voz "exclusivamente" quería decir "principalmente, en gran medida." Ninguna de estas circunstancias concurren en el caso de autos. Nada surge del texto de la Ley, ni de su limitado historial ante la Asamblea Legislativa, ni de los informes que forman su expediente en el Departamento de Estado, que sugiera que debamos dar una interpretación amplia y abarcadora a la exclusión que contiene el segundo

---

(³)Regularmente, recurrimos al diccionario como fuente confiable para determinar el significado de una palabra, presumiendo que el legislador lo conoce. *Cooperativa Cafeteros* v. *La Capital*, 82 D.P.R. 51, 62–63 (1961). Ahora bien, si del trasfondo e historial legislativo del lenguaje que se interpreta surge que el legislador pretendió usar determinada palabra o frase queriendo describir algo distinto de lo que apunta el diccionario, debe prevalecer ese sentido distinto. *Autoridad sobre Hogares* v. *Tribl. Superior*, 82 D.P.R. 344, 359–360 (1961); *Sierra, Com.* v. *San Miguel Fertilizer Corp.*, 73 D.P.R. 341, 346 (1952).

párrafo de su Art. 41.080, *supra*. Especialmente en circunstancias en que está presente una condición limitativa al derecho de las personas a solicitar reparación. Tal limitación debe interpretarse restrictivamente. Véase *Insurance Co. of P.R.* v. *Ruiz*, 96 D.P.R. 175, 179 (1968).

En vista de lo expuesto concluimos que el médico demandado al ejercer la práctica privada a la vez que prestaba sus servicios para el Estado, durante la vigencia de la Ley Núm. 74 de 1976 podía ser incluido como parte demandada en circunstancias como las que presenta este caso. Así, sólo nos resta, para concluir, disponer de sendos planteamientos constitucionales que hacen las partes.

Los demandantes sostienen que según la interpretación que le dio el tribunal sentenciador al citado Art. 41.080, sus derechos constitucionales al debido procedimiento de ley y a la igual protección de las leyes se ven lacerados, por cuanto su resarcimiento de daños no podría ser pleno y tendría que someterse forzosamente a las limitaciones de la Ley de Pleitos contra el Estado. Advertidos, sin embargo, de la correcta interpretación del Art. 41.080 y considerando que el médico demandado no es acreedor a la protección del referido artículo, es innecesario y nos abstenemos por tanto de abordar el señalamiento. Ver, sin embargo, *Wright* v. *Central du Page Hospital Association*, 347 N.E.2d 736 (Ill., 1976); *Jones* v. *State Board of Medicine*, 555 P.2d 399 (Idaho, 1976).

Por otro lado, el médico demandado sostiene que el Art. 41.080, visto en su correcta perspectiva es inconstitucional ya que viola su derecho a la igual protección de las leyes en cuanto protege exclusivamente a los médicos que sólo laboran con el Estado. El planteamiento es inmeritorio. No se trata aquí de una clasificación de las llamadas sospechosas que requieren un escrutinio particularmente acucioso para determinar su procedencia. *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267, 276 *in fine et seq.* (1975); *Wackenhut Corp.* v. *Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972). En

cambio, resulta evidente que merecen mayor protección aquellos médicos cuyos ingresos se circunscriben al sueldo con que puede compensarlos el tesoro público. L. A. Tribe, *American Constitutional Law*, Mineola, N.Y., 1978, sec. 16.4. Se trata, pues, de una clasificación razonable que obedece al principalísimo propósito estatal de enfrentarse a los serios problemas que ponen en riesgo la salud pública. Ver *Legislative Purpose, Rationality and Equal Protection*, 82 Yale L.J., 123 *et seq.* (1972).

*Se dictará sentencia revocando la sentencia sumaria parcial dictada por el Tribunal Superior, Sala de Caguas, en 6 de febrero de 1978 y ordenando se continúen los procedimientos en forma consistente con esta opinión.*

El Juez Asociado Señor Rigau no intervino.