Opinión de conformidad emitida por el
Juez Asociado Se-ñor Rivera García.
As everyone knows, few observations and much discussion are conductive to error: much observation and little discussion to truth. But there are far more minds capable of constructing syllogisms than of accurately grasping the concrete.(1)
[C]ontinually to submit one’s own partial interpretation to the real data involves labor, a sacrifice.(2)
*931 Esta ocasión, matizada por circunstancias sociales e ideologías de amplia diseminación pública, desemboca en la necesidad de pronunciarnos sobre cuestiones trascen-dentales que inciden sobre la esencia misma del Derecho y de nuestra vida en sociedad. Hoy nos encontramos ante una encrucijada que obliga a cuestionarnos si realmente la visión de que más derechos a toda costa equivale a más justicia, es una verdad o una arraigada falacia que, de con-tinuar alimentándose fuera de su justo contexto, puede afectar seriamente el propósito de nuestro sistema de justicia. Recordemos que es un principio establecido firme-mente en nuestro ordenamiento democrático que no hay derechos absolutos. Lozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893, 920 (2010).
En la función adjudicativa que desplegamos como intér-pretes de la ley y de nuestra Constitución, no estamos lla-mados a identificar técnicamente la regla o norma que aplica al caso de autos, sino que tenemos el deber ministerial de imprimirle el sentido que la parte peticionaria y la disidencia se niegan a reconocer en este caso.(3) Hoy enun-ciamos un ratio decidendi con plena consciencia de la fun-ción del Derecho en la sociedad como promotor del bien común, según el estricto estándar de una apreciación sin-cera de los datos que nos provee la realidad y del derecho vigente. Por tal razón, estoy conforme con la opinión ma-yoritaria suscrita por la hermana Jueza Asociada Señora Pabón Charneco.
Ahora bien, sin hacer abstracción de la interpretación objetiva, no sentimental del Derecho, así como de sus efec- *932 tos sociales, me veo precisado a emitir estos pronuncia-mientos. Ello sin la atadura de tomar decisiones o seguir corrientes que resulten simpáticas para ciertos sectores de la sociedad, pues lo que está en juego es el principio rector de garantizar el bienestar de nuestros niños y niñas. Este sector demográfico no puede ser objeto del deseo y de la voluntad de ninguna persona, al extremo de reclamarse en sí mismo como un derecho so pretexto de la no discrimina-ción.
Los hechos de esta controversia están correctamente re-señados en la opinión mayoritaria. Como parte de nuestro análisis, pasemos a señalar las cuestiones fundamentales que ameritan nuestra opinión de conformidad, así como las contradicciones conceptuales de la disidencia.
I
A. La filiación
“ ‘[L]a filiación es la nota de mayor jerarquía en el parentesco y portadora de las más importantes consecuencias jurídicas’ ”. Beníquez et al. v. Vargas et al., 184 D.P.R. 210, 252-253 (2012). Así, la filiación se divide en filiación jurí-dica y filiación biológica, figuras que, según hemos recono-cido, “están vinculadas entre sí, en tanto la primera presu-pone la segunda”. Mayol v. Torres, 164 D.P.R. 517, 529 (2005). En relación con esto, Albaladejo apunta que “el es-tado jurídico de la filiación se basa... en el vínculo natural de sangre... y debe ligar, en principio, a todo generante con todo generado”. M. Albaladejo, Curso de Derecho Civil, Barcelona, Ed. Bosch, 1982, pág. 212. En cuanto a esta distinción entre la filiación como fenómeno jurídico y como hecho biológico, Lacruz Berdejo aporta lo siguiente:
Del hecho de que toda persona deba la existencia a su pro-creación o generación por un hombre y una mujer deriva su *933 filiación (biológica) respecto de sus progenitores, y también su filiación jurídica, expresión para el Derecho, en línea de prin-cipio, de aquella relación biológica. De ese hecho jurídico de la filiación deriva luego la relación jurídica de filiación (de pater-nidad/maternidad, vista desde el lado de los progenitores), en-tendida como la existente entre generantes y generados, padres e hijos con el conjunto de derechos, deberes, funciones y, en general, relaciones, que los vincula en una de las más ricas y complejas instituciones jurídicas y humanas que el Derecho contempla. (Énfasis nuestro). J.L. Lacruz Berdejo y otros, Elementos de derecho civil: derecho de familia, 4ta ed., Barcelona, Ed. Bosch, 1997, T. 4, pág. 419.
En nuestra jurisdicción opera, además, la filiación adoptiva. “La adopción es un acto jurídico solemne, el cual supone la ruptura total [en ciertas instancias] del vínculo jurídico-familiar de un menor con su parentela biológica y la consecuente filiación del menor con aquel o aquellos que han expresado la voluntad de que legalmente sea su hijo”. Zapata et al. v. Zapata et al., 156 D.P.R. 278, 286 (2002). Véanse: Virella v. Proc. Esp. Rel. Fam., 154 D.P.R. 742 (2001); Feliciano Suárez, Ex parte, 117 D.P.R. 402 (1986). “Bajo esta institución, se equipara la relación filiatoria adoptiva con aquella que se produce naturalmente, con iguales deberes y obligaciones jurídicas y sociales”. (Enfasis suplido). Zapata et al. v. Zapata et al., supra, pág. 286.
En consecuencia, hemos expresado que “[l]a adopción como institución jurídica, cumple varios propósitos. En el aspecto social, tiene el fin de brindarle a los niños sin padres la oportunidad de criarse y educarse como es debido en el seno de un hogar adecuado, mientras que a su vez facilita a aquellas personas que loablemente han optado por acoger a dichos niños como si fueran biológicamente suyos, para atenderlos y brindarles el calor y la estabilidad de una familia funcional”. Zapata et al. v. Zapata et al., supra, págs. 286-287.
Sin embargo, hemos expresado que “[e]l propósito de la adopción debe ser alcanzado sin que de ninguna manera se sacrifique el propósito primordial de dicha institución: el *934 bienestar del menor”. (Énfasis en el original). López v. E.L.A., 165 D.P.R. 280, 300 (2005). El Estado no puede per-der de perspectiva en ningún momento que la adopción debe servir el propósito de proteger al menor. Íd.
Consiguientemente, al constituir un acto jurídico de alto interés público, la adopción está rigurosamente regulada por el Código Civil en nuestra jurisdicción, en su vertiente procesal, por la Ley de Procedimientos Especiales, la cual fue enmendada extensamente por la Ley Núm. 186-2009 (8 L.P.R.A. sec. 1051) conocida como Ley de Reforma Integral de Procedimientos de Adopción de 2009.
Por su parte, entre los requisitos sustantivos de carác-ter jurisdiccional para los procedimientos de adopción se encuentran los Arts. 137 y 138 del Código Civil, 31 L.P.R.A. secs. 538 y 539. El Art. 137, en lo pertinente, establece que
[u]na vez decretada la adopción, el adoptado será considerado para todos los efectos legales como hijo del adoptante con to-dos los derechos, deberes y obligaciones que le corresponden por ley. La adopción por decreto final y firme extinguirá todo vínculo jurídico entre el adoptado y su familia biológica o adoptiva anterior. (Énfasis suplido). 31 L.P.R.A. sec. 538.
Como excepción a la norma estatuida en el Art. 137, supra, sobre el rompimiento de vínculos jurídicos del adop-tado con su familia biológica, el Art. 138 del Código Civil permite la adopción por una persona de distinto sexo a la madre o padre de filiación natural existente, para que así no se termine este primer vínculo jurídico. De esa forma, la norma dispone que:
No obstante lo dispuesto en la sec. 538 de este título, los vín-culos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando... el adoptado proviene de una única filiación y es adoptado por persona de distinto seoco al del padre o madre que lo ha reconocido como su hijo. (Énfasis nuestro). 31 L.P.R.A. sec. 539.
Debemos enfatizar que, al describir la figura de la adop-ción, sabiamente, la opinión mayoritaria cita al profesor *935 Serrano Geyls, quien apunta que en este tipo de adopción “prevalece el principio romano adoptio naturam imitatur —la adopción imita a la naturaleza— ya que se establece jurídicamente el parentesco del adoptado no sólo con el adoptante sino con toda su familia”. (Enfasis suplido). R. Serrano Geyls, Derecho de familia de Puerto Rico y legisla-ción comparada, San Juan, Programa de Educación Jurí-dica Continua de la UIA, 2002, Vol. II, pág. 1086. Es inne-gable que el fin de esta figura es imitar la filiación natural para así crear los mismos derechos y obligaciones que tie-nen padres e hijos naturales. López v. E.L.A., supra; Zapata et al. v. Zapata et al., supra. En torno a este extremo, precisa apuntar que, contrario a la filiación biológica, la filiación por adopción es una creación del Estado cuya in-vención se fundamenta en el objetivo de que prevalezca el bienestar del menor. López v. E.L.A., supra, págs. 300-301; Zapata et al. v. Zapata et al., supra, pág. 287. Por tal ra-zón, no existe un derecho fundamental a adoptar. López v. E.L.A., supra, pág. 307. De esto deriva que el objetivo pri-mario de la adopción no consiste en dar un niño a unos padres, sino en dar unos padres a un niño.(4)
Consecuentemente, como bien señala la opinión mayori-taria, las restricciones impuestas en el procedimiento de adopción están sujetas a un escrutinio de racionalidad mí-nima, siempre y cuando no afecten derechos funda-mentales. López v. E.L.A., supra, pág. 307.
B. Igual protección de las leyes
Nuestra Carta de Derechos establece, en lo pertinente, que
[n]inguna persona será privada de su libertad o propiedad sin [el] debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. (Enfasis suplido). *936 Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 296.
La cláusula de la igual protección de las leyes se funda en el principio cardinal de “ ‘trato similar para personas similarmente situadas’ ”. López v. E.L.A., supra, pág. 297. Según hemos establecido, esto implica que el Estado puede, en efecto, hacer clasificaciones entre las personas para cualesquiera propósitos legítimos observando esa norma básica. Íd.; Serrano Geyls, op. cit., págs. 1081-1082; Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201 (1999).
El cimiento de esta atribución del Estado deriva de la concepción básica de que para regir una “sociedad tan com-pleja y variada, en la cual existen distintos intereses indi-viduales y grupales, y diversas relaciones sociales, es nece-sario establecer clasificaciones”. Berberena v. Echegoyen, 128 D.P.R. 864, 878 (1991). Es decir, resultaría una tarea impracticable gobernar cualquier sociedad “sin instituir clasificaciones entre personas, sin construir desigualdades que favorezcan a algunos y perjudiquen a otros”. Serrano Geyls, op. cit., pág. 1081.
Precisamente por esa razón, el principio constitucional de la igual protección de las leyes no exige que se dé un trato igual a todos los ciudadanos siempre, sino que pro-híbe un trato desigual injustificado para personas igual-mente situadas ante la ley. Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1 (2010); Pueblo v. Matías Castro, 90 D.P.R. 528, 531 (1964). En otras palabras, este principio impone un trato igual en situaciones iguales y justifica un trato diferente en situaciones de hecho diferentes. Un trato normativo diferenciado puede considerarse razonable en cuanto está dirigido a realizar otros valores constituciona-les prevalecientes. Es decir, “[e]l Estado puede hacer clasi-ficaciones entre las personas sin infringir dicho principio siempre y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés público *937 legítimo.” Zachry International v. Tribunal Superior, 104 D.P.R. 267, 277 (1975).
Por su parte, cuando se impugna la validez de un pre-cepto legal por atentar contra la igual protección de las leyes, los tribunales, ordinariamente, utilizarán un escru-tinio tradicional o de nexo racional para comprobar su constitucionalidad. Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201 (1999). En este análisis, la clasifica-ción legislativa no se invalidará a menos que sea patente-mente arbitraria y no se pueda establecer un nexo racional entre la clasificación y un interés legítimo del Estado. Zachry International v. Tribunal Superior, supra, pág. 277. Según este escrutinio, la ley en cuestión es constitucional si puede concebirse una situación de hechos que justifique tal clasificación. Id.
Enfatizamos que, en el escrutinio tradicional o de nexo racional, una clasificación o diferenciación legislativa no debe ser declarada inválida o inconstitucional a menos que esta no persiga un interés legítimo, y por lo tanto, sea cla-ramente arbitraria. Así pues, aquel que alega la inconsti-tucionalidad de la legislación tiene el peso de la prueba. Zachry International v. Tribunal Superior, supra.
Cónsono con lo anterior, hemos establecido que cuando el planteamiento de inconstitucionalidad, según esta cláu-sula, se hace contra una legislación de tipo económico o social, el criterio tradicional mínimo solo exigirá que la cla-sificación no sea arbitraria y que pueda establecerse un nexo racional con los propósitos del estatuto. Rodríguez Rodríguez v. E.L.A., 130 D.P.R. 562, 582 (1992).
Por su parte, son clasificaciones sospechosas aquellas que se establecen por razón de raza, color, sexo, naci-miento, origen o condición social, ideas políticas o religio-sas y nacionalidad. San Miguel Lorenzana v. E.L.A., 134 D.P.R. 405 (1993). Mientras, son derechos fundamentales el derecho a la vida, a la libertad de culto, a la libertad de expresión, al voto, a la protección contra ataques abusivos *938 a la honra y el derecho de intimidad. Zachry International v. Tribunal Superior, supra. Sin embargo, cuando se trata de una clasificación sospechosa o de un acto del Estado que afecte algún derecho fundamental, se aplicará el escrutinio estricto para evaluar su validez. Id.
Según el escrutinio estricto, la ley o la actuación impug-nada se presume inconstitucional y el Estado debe demos-trar que existe un interés apremiante que la justifique y que el medio utilizado para promover ese interés es el ne-cesario, esto es, el menos oneroso para adelantarlo. San Miguel Lorenzana v. E.L.A., supra. Debemos, por su parte, recordar que “la Constitución reconoce, al igual que la pro-pia naturaleza diferencias por razón de sexo y permite las mismas si éstas no discriminan”. (Enfasis nuestro). Zachry International v. Tribunal Superior, supra, pág. 279. Ello, pues las diversas disposiciones de nuestra Carta Magna y su aplicación a distintas áreas “no pueden extende[r\ pro-hibiciones absolutas que impidan el ejercicio legítimo del poder de reglamentación del Estado para aprobar medidas razonables con el objetivo de salvaguardar el interés común”. (Enfasis nuestro). Id. En el caso de la adopción, el Estado, según esbozamos, establece como requisitos de esta Institución que se imite la realidad de la filiación biológica cuando se quiere adoptar un menor que ya goza de una filiación. Es decir, en estos casos, cuando se va a insertar otra figura materna o paterna de manera legal, esta debe ser del sexo opuesto, con el fin primario y justificado de que el menor tenga madre y padre.
En esta dialéctica, precisa distinguir los bienes jurídicos en juego, esto es: el bienestar del menor, el principio de la no discriminación, la igual protección de las leyes y, en la penumbra de estos dos últimos, la aprobación de más de-rechos irreflexivamente. Así, se deduce de los términos de la discusión de la parte peticionaria y lo alegado en la disidencia, que el principio de igual protección de las leyes equivale a la “no discriminación”, casi homologándose in- *939 distintamente el primer principio con el segundo concepto.(5) Así, la igualdad se conceptualiza como la “uni-formidad” del régimen jurídico, sin distinciones ni diferen-cias de tratamiento.(6) Sin embargo, dado que “el Derecho no puede ser neutral en un sentido absoluto, [ya que] su objetivo es proteger determinados bienes (y no otros), in-centivar algunos comportamientos (y no otros), desalentar y castigar algunos actos (y no otros), hay que preguntarse [por qué] en los ámbitos permeados por el llamado ‘derecho antidiscriminatorio’ se impone una exigencia de paridad, indistinción y uniformidad de tratamiento [automáti-camente]”. (Traducción nuestra).(7)
Con relación a ello, es pertinente aclarar que el princi-pio de no discriminación produce efectos neutralizantes, pero en sí no es absolutamente neutral. Esto, pues su ratio es un juicio de valor que decide proteger a determinado grupo por razones meritorias.(8) Entonces, en su aparente “neutralidad”, opera como una norma de favor para algu-nos grupos determinados de personas, introduciendo una presunción en su ventaja.(9) Consecuentemente, “el orde-namiento que decide no discriminar no es un ordenamiento que se abstiene, sino que interviene, no es un ordena-miento equidistante, sino uno que obra en la elección de valores, [según su mérito]”. (Traducción nuestra).(10) Así, es imperativo enfatizar que no está dicho que cuando se re-clame el principio de no discriminación a favor de un grupo se tenga que estar exento del equilibrio y nivelación junto con otros intereses estatales y valores de rango constitucio-nal; *940 (11) como son el caso del interés del menor y el principio de la dignidad humana.
C. El planteamiento de discrimen por razón de sexo
Aduce la peticionaria que el requisito de que en este tipo de adopción, el adoptante sea del sexo opuesto al de la madre o padre legal atenta contra la igual protección de las leyes. Específicamente, en uno de sus argumentos expresa que el Art. 138, supra, es inconstitucional por constituir un discrimen por sexo. En ese contexto, alega que el discrimen por razón de sexo incluye en su definición el discrimen por género y por orientación sexual. En ese proceder, la peti-cionaria, equipara los términos de sexo, género y orienta-ción sexual.
Sin embargo, según asevera la opinión mayoritaria, en el caso de autos no procede un escrutinio estricto, porque no estamos ante el discrimen por razón de sexo que pro-híbe nuestra Constitución. Ambos sexos, hombre y mujer, se encuentran en igual posición ante esta disposición. Un hombre no podrá adoptar a un menor si este ya tiene una filiación paterna. Asimismo, una mujer no podrá adoptar a un menor si este ya tiene una filiación materna. Conse-cuentemente, en su diáfana discusión, la Jueza Asociada Señora Pabón Charneco sostiene que el Art. 138, supra, garantiza tanto al hombre como a la mujer el mismo dere-cho de adopción en aquellas instancias en que se pretenda mantener vínculos jurídicos entre el adoptando y su fami-lia biológica. Por ello, reafirmamos que “la prohibición que contiene el Art. 138, supra, se extiende por igual a hombres y mujeres”. (Enfasis en el original). Opinión mayoritaria, pág. 867.
El sentido común nos dicta que el término “sexo” y “orientación sexual” no son equivalentes; mientras el pri-mero es un dato evidente y verificadle, el segundo es un dato no evidente y de difícil verificación, ya que el Estado *941 no puede conocer que lo alegado en cuanto a las preferen-cias sexuales individuales es cierto, por ser mía decisión subjetiva de la persona.(12) En consecuencia, la diferencia-ción por sexo establecida en los requisitos de adopción, es constatable pero, además, necesaria, ya que busca imitar la filiación natural como establecimos. Es preciso enfatizar que el hecho de que exista una distinción, entre los sexos en un estatuto no lo hace inconstitucional y no lo vuelve discriminatorio para esos propósitos. Id., pág. 33. Pueblo v. Rivera Morales, 133 D.P.R. 444, 448 (1993).
Así, tampoco es posible concluir que esta disposición afecta derecho fundamental alguno. Recordemos que no existe un derecho fundamental a adoptar. López v. E.L.A., supra. Además, no se afecta ningún interés sobre el dere-cho a la intimidad, pues la adopción es una creación esta-dual que promueve ciertos intereses definidos y delimita-dos en sus requisitos de índole positivo y procesal. López v. E.L.A., supra. Entre ellos, y el que nos concierne en esta discusión, el requisito de imitar la filiación natural. Recor-demos que en Lawrence v. Texas, 539 U.S. 558 (2003), se estableció que no se justifica la intervención del Estado en la manera como dos adultos decidan manejar sus relacio-nes íntimas. Sin embargo, esa protección constitucional, se-gún declarada en ese caso, no establece un derecho correla-tivo de las parejas del mismo sexo a exigir un derecho a tener el estatus de padres sobre un menor. R.G. Wilkins et al., Adult Sexual Desire and the Best Interests of the Child, 18 St. Thomas L. Rev. 543, 548-549 (2005).
En armonía con lo expuesto, estoy de acuerdo con que *942 “ ‘[t]oda comunidad políticamente organizada tiene... el po-der público del estado (“police power”) para salvaguardar la seguridad, la salud y el bienestar de sus habitantes’ Domínguez Castro et al. v. E.L.A. I, supra, pág. 36. Es por ello que no debemos soslayar el “poder de razón de Estado” para reglamentar sus instituciones con el propósito de fo-mentar o proteger la paz pública, moral, salud y bienestar general, pero sobre todo, el de nuestros menores, en el caso de la adopción. Id.
D. Bienestar del menor: la adopción como realidad natural comprendida en la experiencia fundamental
La Sec. 1 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 2008, pág. 272, dispone que:
La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos prin-cipios de esencial igualdad humana. (Énfasis nuestro).
Como se aprecia, nuestro andamiaje constitucional in-voca textualmente que la dignidad del ser humano en nuestro ordenamiento jurídico es inviolable. Ese principio tiene que ser incólume y, por lo tanto, no puede estar supe-ditado a la maleabilidad de las definiciones que social-mente se quieran alterar. Por consiguiente, es impermisible que, bajo cualquier circunstancia, la dignidad del ser hu-mano se someta a los intereses de un individuo, sus deseos e inquietudes. Esto, pues el ser humano no es un medio, sino un fin en sí mismo.(13)
*943 En vista de lo anterior, comparto la visión de don Jaime Benitez en cuanto a que el principio de la inviolabilidad de la dignidad del ser humano debe ser el “principio moral de la democracia; el principio de que el ser humano y su dignidad constituyen la razón de ser y la justificación de la organización política”. (Enfasis suplido). 4 Diario de Sesiones de la Convención Constituyente 1665 (1961). En ese contexto, de ninguna forma el “ensanchamiento” de las dis-posiciones, que se sugirió durante la discusión de nuestra Carta de Derechos, puede tomarse como licencia para la extrapolación de la prohibición del discrimen, a un derecho de adopción entre parejas del mismo sexo. Id., pág. 2561. Nos explicamos.
En relación con la discusión que nos ocupa, el mejor bienestar del menor no debe ser visualizado exclusiva-mente según el crisol de una relación de amor. El amor es importante para el desarrollo de las relaciones humanas, pero siendo muchas veces confundido con un estado de ánimo subjetivo, no debe ser el único factor imperante de las relaciones de familia. (14) De hecho, legalmente no hay ninguna prohibición a que una persona del mismo sexo del padre o madre legal de un menor, participe en su crianza, le provea ayuda económica y le exprese su afecto.
Sin embargo, la estructura del ser humano es extrema-damente compleja. Su desarrollo, constitución y formación, han sido objeto de innumerables estudios por las distintas ramas de las ciencias. Por lo tanto, relegar jurídicamente a *944 un segundo plano los lazos naturales de la maternidad y la paternidad que dan paso a la vida humana —los cuales busca imitar la adopción— y catalogarlos de relaciones irrelevantes, como sugiere en la disidencia, me parece una conceptualización desafortunada.
Entre los muchos argumentos que consideran la adop-ción por parejas del mismo sexo contraria al bienestar del menor, resulta de particular interés la afirmación de que este necesita una historia creíble de su nacimiento.(15) Por ello, la “homofiliación” no existe porque el nacimiento se origina en la diferencia entre los sexos: ningún niño nace de dos mujeres o dos hombres. Pierre Lévy-Soussan, especia-lista en adopción, propone el mismo análisis, pues incluso si el niño sabe que sus padres adoptivos no son sus padres biológicos, este debe ser capaz de imaginar que podría ha-ber nacido de los padres adoptivos.(16) Tiene que fantasear una escena de nacimiento posible y creíble. Sin embargo, señala el especialista, una pareja del mismo sexo nunca proveerá una historia de generación creíble.(17) Otro motivo de preocupación de la privación de la madre o del padre y su sustitución por dos padres del mismo sexo es que el niño se cuestionará por qué no merece tener una madre o un padre.(18) En ese contexto, habría que preguntarse si no estamos frente a una situación de discriminación todavía más grave de la que se alega existe: unos niños a priori no podrían beneficiarse de aquel bien humano elemental que es tener un padre y una madre sexualmente diferen-ciados.(19)
El fenómeno social que enfrentamos, nos postula serias interrogantes sobre la maternidad y la paternidad, así como su importancia y relevancia en la formación de los *945 niños y las niñas. Estimo que esta es una gran oportunidad para redescubrir el significado de estos conceptos, lla-mando responsablemente a las cosas por su nombre. En última instancia, quienes enfrentaran las consecuencias de nuestras faltas son nuestros niños. Empero, cuando delibe-radamente se intercambian las figuras paternas y mater-nas por la vindicación de un deseo personal —que puede ser loable— se afecta al menor y se trastoca su integridad.(20) Por eso, reafirmo con vehemencia que toda persona, incluso los menores, gozan de igual dignidad y de un lugar de primacía en los procesos de filiación adoptiva. A modo comparativo, en esta discusión centrada en el bien-estar del menor, precisa releer la Convención sobre los De-rechos del Niño. Así, podemos apreciar cómo incluso en ese documento internacional se reconoce esta necesidad de pri-macía sobre los adultos. Ello, pues en el Art. 7 de ese es-crito se le reconoce al niño el derecho, en la medida que sea *946 posible, de conocer a sus padres y a ser criado por ellos.(21) Aunque no es fuente de derecho obligatorio —como tam-poco lo son los demás cambios y legislaciones sobre la ins-titución de la familia en otras jurisdicciones— nos sirve para colocar en su justo contexto la mirada sobre el menor y no sobre el deseo del individuo.
Agradezco el tono de decoro y respeto con que el Juez Presidente Señor Hernández Denton acepta y se dirige a las críticas que expongo en mi ponencia conforme a este momento crucial para los niños y niñas, y la historia de Puerto Rico. Comparto con él profundamente una actitud de sensibilidad ante los problemas reales que enfrentan las personas y la necesidad imperativa de proteger la dignidad y la igualdad del ser humano. En ese proceder, mi concien-cia me lleva a inclinar la balanza hacia el favor de los menores. Precisamente, teniendo presente esa sensibilidad hacia los niños y niñas, la tradición jurídica ha presentado criterios “discriminantes”, fijando los requisitos para poder adoptar. Como hemos expuesto, en nuestra jurisdicción históricamente se ha conceptualizado la adopción para que el menor tenga ambas figuras, madre y padre, siguiendo la filiación natural. Al traer criterios de diferenciación siem-pre alguien queda postergado, pero ello no implica que au-tomáticamente el Estado está discriminando. Si se quisie-ran eliminar criterios de exclusión estaríamos afirmando la existencia de un derecho absoluto a adoptar en cualquier caso y por cualquier persona, transformando el niño en un bien de consumo al alcance de cualquier adulto que lo solicitara. Sin querer menospreciar a nadie, enfatizamos que lo que está en discusión son los criterios que más favo-rezcan el bienestar del menor en el caso de la adopción. Según lo expuesto por el Juez Presidente, la adopción por parte de la peticionaria AAR —cuando la menor JMAV ya *947 tiene una filiación materna— resultaría en el mejor bien-estar de la menor, y “denegarla resultaría en un grave per-juicio para [ella]”.(22) Nos preguntamos en qué se apoya esta convicción. ¿En las cualidades personales de AAR? Esto es un dato que no podemos verificar y nos parece que no podemos crear un antecedente jurídico a base de una motivación particular. ¿Por qué entonces es mejor tener dos mamás que una? ¿Por un simple hecho numérico? Es muy probable que sin darse cuenta, esta opción a favor de una pareja de mamás sea el remanente de aquella convic-ción que el Juez Presidente quiere combatir. Esto es, que lo natural es ser hijo de una pareja conformada por dos: mu-jer y hombre. Sin embargo, mientras en el caso de la pareja mujer y hombre el criterio de dualidad en la adopción se justifica por la diferencia de los sexos, fuera de la referencia a la condición natural de la filiación —en el caso de una pareja de “mamás” o de “papás”— esta dualidad perdería sentido. Además, perdería consistencia el argumento que propone el compañero; es decir; que sería un grave perjuicio para la menor no ser adoptada legalmente por una segunda mamá. En efecto, quitando la referencia natural, quedaría como único criterio la cuestión numérica llegando al ilógico pensar que si dos madres son mejor que una, entonces tam-bién tres madres serían mejor que dos, y cuatro mejor que tres.
E. La ideología de género en el entrelineas de la disidencia
El razonamiento propuesto en la disidencia olvida la le-tra de la ley y la realidad natural, y relega a un segundo plano desde sus inicios el interés del menor. Se entrevé que el foco de su discusión son los derechos que reclama la peticionaria.(23) Sin embargo, para adelantar ese interés da *948 por ciertos, sin recelo alguno, los riesgosos postulados que pondera promover. De acuerdo con la ideología del género, equipara los términos de sexo, género(24) y orientación sexual, y luego, confusamente los desliga. Ello, ignorando que esta ideología está bajo una amplia discusión pública y en entredicho. (25) Muchos académicos y parte de la opinión pública han rechazado la ideología de género. Esta co-rriente del feminismo radical —que acuña la exposición de la disidencia entrelineas a través de los escritos citados— “realiza varias afirmaciones que le comprometen con una determinada manera de entender la naturaleza humana (una pizarra en blanco en el momento del nacer)”. (Enfasis *949 nuestro).(26) Esa visión asume la construcción social de la identidad de sexo y afirma que las diferencias entre hombres y mujeres no tienen nada que ver con la biología, sino con los procesos de socialización.(27)
Sin embargo, varios autores han señalado que esta ideo-logía es “anti-intelectual” por su rechazo a la ciencia y a otros campos relacionados con la naturaleza humana, tales como la genética, las neurociencias o la psicología, las cua-les “contradicen el carácter meramente social de las dife-rencias entre hombres y mujeres”.(28) Vale recalcar que la mayoría de las académicas y los académicos se identifican con un feminismo equitativo, que afirma que la “igualdad no significa afirmar empíricamente que todos los humanos son intercambiables; es el principio de que los individuos no se han de juzgar ni limitar por las propiedades medias de sus grupos”. (Énfasis nuestro).(29) Sin embargo, “[l]as críticas o la desviación con respecto al enfoque de género a menudo son consideradas políticamente incorrectas, por lo que muchos evitan adentrarse en un terreno movedizo”. (Énfasis nuestro).(30) Mi conciencia, en cambio, no me per-mite evadir la responsabilidad de plasmar mi juicio crítico como miembro de esta Curia.
Es preciso notar que en el espíritu de las legislaciones de “vanguardia” que adoptan la identidad de género, el ser *950 humano se libera definitivamente de las connotaciones cor-porales y se afirma independientemente de ellas.(31) Según estas teorías, el sujeto “se vuelve pura libertad”, pero “se afirma un yo desencarnado, abstracto, un fantasma de sí, en el que el cuerpo no cuenta, o quizás peor, es casi un estorbo”. (32) Resulta interesante el comentario de la Jueza del Tribunal Constitucional italiano Sra. Marta Cartabia, en cuanto a que parece que a la cultura jurídica actual “le fatiga tener una mirada abierta sobre el ser humano en su integridad, en toda la verdad” de su espíritu y cuerpo.(33) Así identifica que se quiere impulsar la idea de un ser hu-mano emancipado, no solo de las relaciones sociales, fami-liares y relaciones en general, sino emancipado hasta de su propio cuerpo; con un “yo” “independiente” que rechaza cada dependencia de hecho y relacional que él mismo no haya decidido, escogido y construido autónomamente. (34) Señala que se prescinde incluso del propio cuerpo.(35) Es decir, se crea un ser humano incapaz de aceptar el dato de la realidad. De ahí la negación de que la maternidad per-tenece a la madre y la paternidad al padre por sus capaci-dades y razones biológicas. Estos conceptos, se reducen a un mero rol dictado o impuesto por la sociedad, no inextricable a la persona por la tenencia de determinado sexo.
Empero, siguiendo la ideología de género aplicada en su vertiente jurídica al palio de los principios de no discrimi-nación, la disidencia del Juez Presidente Señor Hernández *951 Denton nos invita a equiparar la definición de sexo a gé-nero, y luego el concepto género a orientación sexual. Lo inaudito es que en ese razonamiento acoge esta controver-tida corriente de pensamiento como verdad absoluta sin ninguna prueba científica y social, poniendo en entredicho el hecho biológico y la necesidad de las figuras materna y paterna para el ser humano. De esa forma, quiere borrar de un plumazo la realidad de nuestro ordenamiento jurí-dico en cuanto a que la filiación adoptiva imita a la filia-ción natural, porque hay que garantizar a toda costa que no se discrimine por orientación sexual. Sin embargo, más allá de equiparar todo vocablo y meras alegaciones, no se explican los términos de su discusión ni por qué los pre-fiere sobre la realidad patente de los hechos de la paterni-dad y la maternidad que por biología disfrutan distinta-mente cada sexo, hombre y mujer. Cita así definiciones conflictivas que, a su vez, fundamentan su posición en ase-veraciones no demostradas y carentes de fuentes científi-cas y de derecho con autoridad, lo suficientemente arraiga-das y probadas como para desterrar, sin más, la institución de la adopción según concebida en nuestro ordenamiento jurídico (Art. 138, supra).
En ese marco, nuestra postura, lejos del “insularismo judicial” que alega el Juez Presidente, rechaza lo que pare-ciera una especie de sutil colonialismo totalitario sobre las mentes. Esto, tomando en cuenta lo que expresa José Eugenio Azpíroz Villar en su ponencia “Ideología y violencia de género” con motivo de las Jornadas Violencia de Género a Debate en la Facultad de Derecho de la Universidad Complutense de Madrid el 21 de mayo de 2010:
Realmente la ideología de género ha sido impulsada por una pequeña minoría intelectual (en la que destacan los nombres de Shulamith Firestone, Rebecca Cook, Bella Abzug, represen-tante de Estados Unidos en Pekín, Alison Jagger, Caroly Han-nan, Heidi Hartmann, o, Carol Christ, por citar los más rele-vantes) pero de gran influencia social como resultado de la asunción de sus postulados por gran parte del mundo univer- *952 sitario, especialmente en Universidades y Colleges de Estados Unidos, por su aceptación y la consiguiente propagación de sus ideas por los medios de comunicación social y por el inestimable apoyo prestado por Instituciones Internacionales... y por las instituciones europeas.
Tal vez porque sus propuestas son disparatadas, (recuerdo en este foro que los juristas solemos decir en relación a los contratos que “son lo que son con independencia de cómo los denominen las partes” afirmación evidentemente opuesta a la ideología de Feminismo radical en cuanto pretende sustituir lo “que es”por lo que “se quiere ser”). (Énfasis nuestro).(36)
Asimismo, su opinión disidente soslaya la realidad natural que el estado de derecho pretende seguir; es decir, que una niña o un niño adoptados tengan padre y madre. ¿Por qué concluir sin objeción alguna que durante todo este tiempo hemos estado ciegos y que, en realidad, un niño no necesita la referencia paterna y materna para su desarro-llo? ¿De repente resulta que todos los estudios sociales, que así lo afirman, son irrelevantes porque una minoría de aca-démicos y feministas radicales alegan lo contrario? ¿Acaso cada vez que surja una nueva ideología tenemos que cam-biar nuestro estado de derecho y reescribir nuestra Cons-titución? Que me disculpen esos sabios estudiosos, pero no puedo hacerme de la vista larga para satisfacer la opinión pública e ignorar que “el emperador está desnudo!”. (Enfa-sis nuestro).(37) Ante el difuso análisis propuesto, no me queda otra opción que hacerme eco de las expresiones de Wendell Holmes, Jr. cuando aseveraba que “en este tiempo más que educación en lo oscuro, necesitamos educación en lo obvio”.(38) Lamentablemente, bajo la bandera de la evo-lución de la interpretación de la Constitución, la disidencia *953 necesariamente termina catalogando de “congelados”, “fo-silizados” y “piezas de un museo de historia” los conceptos maternidad y paternidad. Se considera anquilosado el he-cho de que los intereses del menor están mejor servidos en hogares estables con ambos: padre y madre.
Por mi parte, en este momento histórico de nuestra cul-tura, afirmo que las figuras de padre y madre no son inter-cambiables y sí importan.(39) En consecuencia, creo firme-mente que, por dignidad humana, todos los niños tienen el derecho a crecer y formarse en el seno de una relación de padre y madre, claro está, reconociendo que en la vida co-tidiana surgen circunstancias que inevitablemente conlle-van la ausencia de tales figuras e incluso se pueda dar la adopción por una sola persona.(40) Sin embargo, lo anterior no nos obliga a concluir que la sustitución de la identidad de las figuras de madre y padre es un bien para el menor, pues está en juego su desarrollo integral y su autonomía personal. Hay diferencias significativas innatas entre mu- *954 jer y hombre, dictadas por los genes y las hormonas que van más allá de la anatomía básica. Estas diferencias son evidentes y exclusivas, e influyen de manera única en el desarrollo del menor.(41) Cónsono con lo anterior, el Estado no puede legitimar que nadie, absolutamente nadie, re-clame a los menores para sí como objetos de un derecho al palio de una guerra de sexos o ideologías de género. Estoy convencido que el bienestar del menor y, por tanto, los de-rechos del niño están sobre cualquier derecho que en este contexto pretenda reclamar el adulto.
No sustento mi criterio en ideologías ni fundamenta-lismo alguno. Más bien baso mi opinión en el derecho vi-gente y en la realidad patente, en la cual se conciben los hijos a través de la relación paterno y materno filial; la cual incluso puede ser interrumpida por el Estado en su poder de parens patriae. Que hoy se quiera negar el dato biológico para trastocar la realidad y reclamar derechos sobre otra persona, no me nubla el juicio. El hecho de que en nuestra época los conceptos maternidad y paternidad se hayan vaciado de significado, no implica que podamos omi-tir la necesidad de esas figuras para un niño. Tal vez, este mismo olvido, entre otros, es el detonante del estado de deterioro social que vivimos.
Este proceder no implica que no existan diversas formas de sexualidad con todas sus consecuencias psicológicas y antropológicas. Empero, el menor es prioritario en nuestra *955 decisión y no puede ser objeto de la reivindicación de un reclamo subjetivo.
Asimismo, que existan diferentes técnicas de reproduc-ción asistida no imposibilita que hagamos este reconoci-miento. De igual forma, que sepamos sobre las situaciones de convivencia privada actuales, no implica que haya que institucionalizar sus particularidades al punto de que ten-gan efectos irreversibles sobre una tercera persona vulnerable, como lo es el menor. La realidad natural que persi-gue imitar la figura jurídica de la adopción debe ser nuestro norte, pues la referencia de padre y madre es esen-cial en su función de ser.
Cuando la disidencia del Juez Presidente cuestiona los valores que promueven la familia como pilar de la sociedad y pretende hacernos pensar que es igual que un menor tenga dos papás o dos mamás al final de su argumentación, recuerdo la historia siguiente:
My father left my family when I was 2 years old, and I knew him mainly from the letters he wrote and the stories my family told. And while I was lucky to have two wonderful grandparents who poured everything they had into helping my mother raise my sister and me, I still felt the weight of his absence throughout my childhood.
As an adult, working as a community organizer and later as a legislator, I would often walk through the streets of Chicago’s South Side and see boys marked by that same absence — boys without supervision or direction or anyone to help them as they struggled to grow into men. I identified with their frustration and disengagement — with their sense of having been let down.
In many ways, I came to understand the importance of fatherhood through its absence — both in my life and in the lives of others. I came to understand that the hole a man leaves when he abandons his responsibility to his children is one that no government can fill. We can do everything possible to provide good jobs and good schools and safe streets for our kids, but it will never be enough to fully make up the difference. —Presidente Barack Obama.(42)
*956 Negar con alevosía la necesidad existencial de una niña o un niño a contar con las figuras de padre y madre distin-gue una visión irracional. En aras de vindicar un deseo, hoy, a conveniencia personal, se quiere borrar la identidad de hombre y mujer, censurando una de las atribuciones más determinantes en su vida que por biología le pertenece: la maternidad y la paternidad. En consecuencia, se ase-vera que estas nunca existieron; fueron nuestra “construcción”. Sí, definitivamente “[Z]a ideología no es la ingenua aceptación de lo visible, sino su inteligente destitución”.(43) (Enfasis nuestro). En las arenas movedizas de un propuesto “lavado de cerebro colectivo”, se pretende desarticular la adopción. ¿Hasta dónde llegaríamos si nuestro marco jurídico no pudiera distinguir la obvia rea-lidad? Es una psicosis social de la cual rehúso participar por ser contraria a la dignidad humana.
II
Tomando en cuenta lo auscultado, hago unos breves pro-nunciamientos sobre los argumentos que bosquejan otras opiniones disidentes. Por ejemplo, la opinión disidente de la Jueza Asociada Señora Rodríguez Rodríguez invoca una teoría de interpretación constitucional basándose en el “cambio” del significado del texto de nuestra Constitución. Como muy bien se explica en la Opinión mayoritaria y en la Opinión de conformidad del hermano Juez Asociado Se-ñor Martínez Torres, esa manera de interpretar la Consti-tución es incompatible con el sistema democrático que rige en Puerto Rico.
Más allá del debate en cuanto a la utilización de la teo-ría de la “constitución viva” en nuestro ordenamiento,(44) lo *957 más preocupante es que la disidencia no nos revela cuál es el criterio rector que se debe utilizar para encontrar el “cambio” en el significado de las palabras de nuestra Carta Magna. Si examinamos con detenimiento, lo que mani-fiesta ese disenso es una visión muy personal sobre lo que debe ser el significado de la Constitución, lo cual, a su vez, prevalece sobre cualquier otro mecanismo de inter-pretación. Es decir, la Constitución vive a través de lo que un Juez individual considere que es una “vida” apropiada. No hay esfuerzo alguno por ilustrarnos cuál fue el criterio rector que llevó a que la palabra “sexo” ya no signifique lo que nuestros constituyentes dijeron que significaba. Así pues, la palabra “sexo” en nuestra Constitución significa lo que un sujeto particular entienda que significa. Parece que se entrevé nuestra Carta Magna bajo lente de la ideología en la que alega que todo es una construcción social. Por ello, el llamado a que reconozcamos “el palimpsesto signi-ficativo que exige el lenguaje de nuestro texto legal”, es peligroso. Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 1001. La utilización particular del vocablo “palimpsesto” revela lo que verdaderamente promulga la tesis de la compañera Jueza. Según la Real Academia Española, “palimpsesto” significa “[t] ablilla an-tigua en que se podía borrar lo escrito para volver a escribir”. (Enfasis nuestro).(45)
*958 De entrada, difiero profundamente de la visión que pro-mueve que nuestro texto constitucional es una tablilla en la que los Jueces podemos borrar y reescribir cuando esti-memos conveniente, aceptando como ciertas definiciones que aún están por verse. Pero todavía si aceptáramos que los Jueces de este Tribunal tenemos el poder para borrar y reescribir la Constitución, entiendo que debe revelarse cuál fue el razonamiento para desafiar lo concreto y palpable e imponer “nuevas palabras” en nuestra Constitución. Sin eso, nos encontramos ante un ejercicio de interpreta-ción completamente arbitrario.
La falta de ese juicio es lo que quizás sirve de causal para las grandes contradicciones de la disidencia. Como veremos, esas contradicciones se extienden desde la opi-nión disidente que emite hoy, hasta chocar con sus pala-bras y expresiones pasadas. Veamos algunas de estas contradicciones.
Primero, a través de todo su disenso la compañera Jueza Asociada sostiene en varias ocasiones que este Tribunal debe ser consciente de que “[l]a Constitución que interpretamos es la del Estado Libre Asociado de Puerto Rico, no otra...”. Opinión disidente de la Juez Asociada Se-ñora Rodríguez Rodríguez, pág. 1036. Sin embargo, en un intento fallido de encontrar un criterio rector para susten-tar su tesis, llega al extremo de utilizar una decisión del Tribunal Constitucional español para “encontrar” el nuevo significado del vocablo “sexo” en nuestra Constitución. Id., págs. 1031-1032. Aparentemente, la definición de “sexo” en nuestra Constitución puede cambiar según lo que inter-prete un tribunal extranjero en cuanto a su propio docu-mento constitucional.
Esta contradicción se repite en parte cuando se avala la utilización de un escrutinio intermedio para analizar con-troversias constitucionales a la luz de la cláusula de igual *959 protección de las leyes. Ello me resulta curioso, ya que, a pesar de sostener que “[l]a Constitución que interpretamos es la del Estado Libre Asociado de Puerto Rico, no otra”, no se tiene problemas en adoptar un escrutinio que se originó en la Constitución federal y que reiteradamente una ma-yoría de este Tribunal ha rehusado avalar. Así que, de ma-nera contradictoria, se culmina mirando a otras dos cons-tituciones, a la vez que sostiene que solo podemos mirar la de Puerto Rico.
Sin embargo, lo más contradictorio de la opinión disi-dente que emite la Jueza Asociada Señora Rodríguez Ro-dríguez es el irremediable choque entre los fundamentos que utiliza y el ratio decidendi de lo que suscribió en el caso Delgado, Ex parte, 165 D.P.R. 170 (2005).
Específicamente, en Delgado, Ex parte, supra, pág. 192, la compañera Jueza sostuvo que “[e]n ausencia de legisla-ción que expresamente lo autorice, estamos impedidos de reconocer como viable un cambio sustancial en las constan-cias del certificado de nacimiento de lo que es un hecho vital de la persona, esto es, su sexo”. (Énfasis nuestro). A su vez, añade que [c\uando el lenguaje de la ley es claro e inequívoco, nuestra responsabilidad es respetar la voluntad legislativa, independientemente de nuestro criterio personal”. (Énfasis nuestro). Id.
Empero, en esta ocasión la Jueza Asociada se distancia abismalmente de los postulados que anteriormente defen-dió a capa y espada. Y es que en el caso de autos la com-pañera Jueza nos invita a que ignoremos la realidad natural y a que obstinadamente asumamos el rol de la Asamblea Legislativa.
Nuestro sistema republicano de gobierno, basado en la separación de poderes, nos impone la responsabilidad de resolver controversias conforme al estado de derecho vi-gente, mas no así de formular y aprobar legislación, menos aun cuando las propuestas “jurídicas” en juego suponen negar la realidad de nuestra historia legal y humana. *960 Cuando juré al cargo de Juez Asociado de este Tribunal, me comprometí a respetar esta limitación de nuestro Poder Judicial y hoy no es la excepción. Como mencioné, el estado de derecho vigente en relación al tema que nos atañe, re-fleja un bien jurídico que debemos proteger: el bienestar del menor. En ese contexto, no contemplo lagunas ni necesidad de alterar de forma alguna, una norma que protege el in-terés del menor. Precisamente porque el día de mi jura-mentación expresé que “[e]s imperativo que el juzgador no se desprenda del contexto social, económico y cultural al momento de desempeñar su delicada función”, es que hoy afirmo lo que muchos se niegan a afirmar, ya sea por te-mor, simpatías o por una visión parcializada y tendente a la aprobación de más derechos por encima de los derechos de nuestros niños y niñas. El dinamismo judicial en el que creo, lo promulgo, no cuando otros miembros de esta Curia personalmente lo entiendan necesario, sino cuando mi con-ciencia me lo dicte, y así lo avalen la razón y la realidad natural. Por esta razón, es mi obligación rechazar la invi-tación que nos hace la Jueza Asociada y señalar por qué no podemos sucumbir ante la tentación de “hacer justicia a la trágala”, a su manera.
No me sorprenden los comentarios que con “respeto” se hacen a mi persona en una nota al calce de su opinión. Me limito a reafirmar que mis argumentos se basan en el de-recho, en hechos y datos naturales y antropológicos que, aunque pueden no estar de moda, responden a evidencias científicas, jurídicas y sociales. Que los conocimientos deri-vados de las ciencias y el derecho se aparten de la cosmo-visión de moda propuesta por la ideología de género, no es óbice para que me exprese libremente a tono con mi respon-sabilidad como miembro de esta Curia, apreciando todos los factores en juego.
De una simple lectura de la referida ponencia se tiene la impresión de que para ser un miembro digno de este Tribunal hay que renunciar a las evidencias de las ciencias, a *961 la tradición jurídica y a la razón, para seguir obligatoria-mente la ideología en boga “universal” que se profesa y se pretende imponer a mí y a Puerto Rico. A pesar de haber enunciado los principios y razones de nuestra conformidad, la Jueza considera mis expresiones “fundamentalistas”,(46) usando un término de moda en el foro mediático que, sin embargo, denuncia más una carencia de argumentos que la tenencia de razones válidas. Asimismo, compara mi pos-tura con los argumentos contenidos en los alegatos de la Alianza de Juristas Cristianos y de la Coalición en Defensa de la Familia. (47) Lo triste es que no solo ataca mi criterio, sino que, “con el peso que tiene esta Institución”, intenta promover el destierro del foro democrático a personas y asociaciones que tienen una “cosmovisión” diferente o con-traria a la suya. Lo irónico es que al así proceder, la com-pañera parece no darse cuenta de que ella misma es por-tadora de una cosmovisión particular que “nieg[a] la posibilidad del pensamiento crítico como un ejercicio válido de la razón y [del] quehacer jurídico”.
Reitero que el ataque ad hominem a los miembros de esta Curia y a la diversidad sociopolítica que hace la dis-tinguida compañera es lamentable. Esta olvida que sus mismos ataques pudieron haber sido dirigidos a su persona tras suscribir su opinión en Delgado, Ex parte, supra, cuando su “cosmovisión” era otra. La realidad es que nues-tra postura no está fundamentada en visiones moralistas, sino en el derecho vigente; a menos que se quiera llamar “moralista” cualquier perspectiva jurídica que considera necesario anclar las leyes a las exigencias morales funda-mentales de la justicia, de la igualdad y de la libertad. Mi visión, particularmente, está fundada en el interés de ha-cer justicia al menor y no en complacer todos los deseos del adulto. Este interés va más allá, incluso, de lo que la pro- *962 pia menor pueda emotivamente percibir. Al proclamar este hecho, espero igualmente la tolerancia y el respeto que to-dos los miembros de este foro colegiado se merecen.
Por otro lado, la opinión disidente que suscribe el her-mano Juez Asociado Señor Estrella Martínez amerita tam-bién unas líneas.
Debo señalar que ninguna de las partes del caso de autos ni los amicii curiae propusieron la tesis de que el Art. 138 del Código Civil, supra, no aplica a la controversia de marras. Sin embargo, el compañero Juez nos remite a la existencia de una nueva filiación, la social, para sustentar su posición. Insisto en que más allá de lo que su razona-miento pueda esgrimir, el bienestar de la menor no se puede medir a base de sentimientos ni construcciones humanas.(48) Afirmo, como mencioné, que el hecho de que exista la concepción por medios artificiales, no puede ser un escollo para que el menor producto de esta tenga el derecho a tener madre y padre. Después de todo, al igual que en sus inicios se necesitó la aportación biológica de cada uno —entiéndase “óvulos y espermatozoide”— así también se necesitará a través de la vida del menor la aportación característica y particular de la figura de la ma-dre y del padre para su desarrollo integral.
De esta manera, la “liberalization” del proceso de adop-ción que proclama esta disidencia no es otra cosa que ne-garle al menor el derecho a conocer su identidad biológica y contar con estas figuras distintas y necesarias. ¿Cómo en-tonces se puede reclamar que la mirada está puesta en ella (la menor)? No, considerando lo discutido, es obligado con-cluir que en el análisis propuesto, verdaderamente, la mi-rada está puesta en el deseo del adulto convertido en un derecho al que se le otorga mayor jerarquía que al bienes-tar del menor. De esta forma, disfrazado de causas nobles, se quiere despojar al menor de la diversidad que se obtiene de ambas referencias, paterna y materna. Por las razones *963 expuestas, esto opera necesariamente en detrimento del menor, reconozcámoslo o no. Ante su tesis de filiación social inducida, me hago eco de las expresiones del Presi-dente de nuestra nación americana en cuanto a que “si todos son familia, entonces nadie es familia”.(49)
En fin, reitero mi conformidad con la opinión mayorita-ria que hoy se emite. Me conforta que una mayoría de los miembros de este Foro reconozcan que ostentar una toga en la Rama Judicial no nos permite rebasar los límites de lo permisible en nuestro sistema constitucional, ni reducir con ello la realidad en conformidad con las ideologías “anti-intelectuales” que ciertos sectores pretenden promover. Lo contrario sería faltar a la confianza que el Pueblo depositó en su Constitución y en este Tribunal.
— O —

 A. Carrel, en: M. Bersanelli y M. Gargantini, From Galileo to Gell-Mann, Philadelphia, Tempelton Press, 2009, pág. 50.

 Bersanelli y Gargantini, op. cit., pág. 49.

 Hoy nos alejamos de una noción exclusivamente positivista de la norma que se ha de interpretar, pues:
“El positivismo falla en intentar definir el derecho sin referencia a sus fines. No se puede definir una silla simplemente a base de sus elementos formales: las patas, el asiento, el respaldar .... Es indispensable que la definición incluya la referencia a su propósito”. J. Trías Monge, Teoría de la adjudicación, San Juan, Ed. UPR, 2000, pág. 265.

 X. Lacroix, La confusion des genres: réponses á certaines demandes homo-sexuelles sur le mariage et l’adoption, Paris, Ed. Bayard, 2005.

B. Randazza, M. D’Amico, M. Cartabia et al., Alla frontiere del dittrito cons-tituzionale: scritti in onore di Valerio Onida: Riflessioni in tema di eguaglianza e di non discriminazione, Milán, Ed. Giuffré, 2011, págs. 422-423.

 Íd.

 Íd., págs. 421-447.

 Íd., pág. 446.

 Íd.

 Íd.

 Íd.

 Por eso, la lucha contra la discriminación por orientación sexual no se puede colocar directamente en la línea de la lucha a favor de la no discriminación por razón de raza o contra la mujer, pues en estos últimos casos estamos frente a datos objeti-vos independientes de la elección del sujeto. En el caso de la orientación sexual, hay siempre una posibilidad de interpretación y de decisiones autónomas: no se tiene una orientación sexual, como necesariamente se pertenece a una raza o se tiene un de-terminado sexo. Más aun, no podríamos hablar de la clasificación por orientación sexual en el caso de la adopción, pues esa “decisión autónoma” tiene repercusiones sobre terceros, es decir, el menor. Por ello, tampoco es comparable con la clasificación por razón de religión o creencias políticas. Véase Lacroix, op. cit.

 Véase, e.g., R.P. George, Natural Law, 31 (Núm. 1) Harv. J.L. & Pub. Pol. 171-196 (2008). Resulta pertinente la discusión del autor:
“There are human rights if there are principles of practical reason directing us to act or abstain from acting in certain ways out of respect for the well-being and the dignity of persons whose legitimate interests may be affected by what we do. I certainly believe that there are such principles. They cannot be overridden by considerations of utility... At a very general level, they direct us, in Kant’s phrase, to treat *943 human beings always as ends and never as means only. (Énfasis nuestro). Íd., pág. 174.

 Al ser un tema de amplia discusión pública por las circunstancias actuales de Francia, varios psiquiatras, psicoanalistas y especialistas en adopción hicieron expresiones a la prensa sobre la paternidad de personas del mismo sexo. No nos sorprende que señalen que estas parejas pueden amar y educar a los niños. Sin embargo, cuestionan la construcción psicológica en la que se coloca al niño, pues se le asignan dos madres o dos padres legales, lo cual no es una situación real creíble para este. Véase Le Temps Société, Homoparentalité: la querelle des psychanalystes, 19 de octubre de 2012. Artículo disponible en: http://www.letemps.ch/Page/Uuid/1c1108c4-1959-11e2-aecd-ec3c890cd379/ Homoparentalit%C3%A9_la_querelle_des_psych analystes.

 Íd.

 Íd.

 Íd.

 Íd.

 Lacroix, op. cit.

 Más de treinta años de investigación confirman que los niños se desempe-ñan mejor cuando son criados por dos padres biológicos. Así, los niños navegan por sus correspondientes etapas más fácilmente, desarrollan una identidad sólida y rea-lizan una mejor labor académica. Asimismo, tienen menos trastornos emocionales y mejor funcionamiento cuando son criados por adultos en su familia natural. La mo-noparentalidad, la adopción y las segundas nupcias repercuten sobre el desarrollo del menor implicado, pues le exigen ajustes y retos únicos de adaptación. Si bien estos escollos no son insuperables, cada situación tiene sus particulares desafíos para el niño. Por ejemplo, es una realidad que la mayor parte de las madres y los padres solteros enfrentan grandes desafíos financieros y limitaciones de tiempo para criar a sus hijos. Mayormente, los hijos de madres solteras suelen estar menos tiempo con ambos padres biológicos. En el caso de los niños con padrastros o madras-tras, enfrentan el problema de lealtades divididas. El adoptado, por su parte, debe superar el rechazo de sus padres biológicos o la falta de alguno de estos; asimismo, anhela conocer sus raíces. Sin embargo, al margen de estas situaciones excepciona-les, privar a un niño de las figuras de padre o madre no es saludable. Homosexual Parenting: Is It Time For Change?, American College of Pediatricians, marzo 2012, disponible en: http://www.acpeds.org/parenting-issues/82-homosexual-parenting-is-it-time- for-change- (última visita 4 de febrero de 2013).
Ante los nuevos modos de convivencia se realizó un estudio que se centró en los niños criados en relaciones del mismo sexo y los comparó con los que crecieron con padres del sexo opuesto. La investigación muestra claramente que los niños que crecen en familias con padres biológicos tienden a desarrollarse mejor que sus pares criados por parejas del mismo sexo. D. Potter, Same-Sex Parent Families and Children’s Academic Achievement, American Institutes for Research, 24 de mayo de 2010. Disponible en: http://www.baylorisr.org/wp-content/uploads/Potter.pdf (última visita 4 de febrero de 2013).

 Convención sobre los Derechos del Niño, adoptada y abierta a la firma y ratificación por la Asamblea General de las Naciones Unidas en su resolución 44/25, Art. 7, 20 de noviembre de 1989.

 Opinión disidente Juez Presidente Señor Hernández Denton, pág. 992.

 Su escrito comienza señalando que: “El recurso ante nos representa una oportunidad histórica para respetar cabalmente una de las garantías más funda-mentales de nuestra Carta Magna: ‘[Todas las personas] son iguales ante la ley’ ”. Opinión disidente del Juez Presidente Señor Hernández Denton, págs. 963-964. Ese *948 análisis puede ser necesario a fin de dirimir la controversia que se presentó ante esta Curia. Ahora bien, no podemos abstraemos de que el derecho reclamado incide sobre un menor a quien en virtud del poder de parens patriae, le debemos garantizar el mejor bienestar. Es en ese punto en que el reclamo de la peticionaria debe supedi-tarse a lo que en derecho es el mejor bienestar del menor. Esto inexorablemente implica que nuestra discusión se debe centrar en justipreciar si el derecho reclamado por la peticionaria va en concordancia con el mejor bienestar del menor y no si el menor es un medio adecuado para garantizar el derecho reclamado por la peticionaria.

 Resulta de especial interés é importancia el que para explicar la adopción del término “género” el Juez Presidente acuda a la serie de ensayos sobre intersexua-lidad publicados por el Dr. John Money. La tesis del referido doctor se llevó al ex-tremo, provocando consecuencias nefastas, tal como se reseña en As nature made him: the boy who was Raised as a girl, infra. Proveemos un abstracto de esta obra:
“In 1967, after a twin baby boy suffered a botched circumcision, his family agreed to a radical treatment that would alter his gender. The case would become one of the most famous in modern medicine-and a total failure. As Nature Made Him tells the extraordinary story of David Reimer, who, when finally informed of his medical history, made the decision to live as a male. A macabre tale of medical arrogance”, http://www.goodreads.com/boolc/show/41379.as_nature_made_him.
“Dr. John Money was a psychologist specializing in sex changes. He believed that it wasn’t so much biology that determines whether we are male or female, but how we are raised”. (Luego Reimer se suicidó). Health check: The boy who was raised as a girl, http://www.bbc.co.uk/news/health-11814300.

 Véase la tesis doctoral de Ana C. León Mejia, Una aproximación analítica al feminismo de género, Universidad Autónoma de Barcelona, septiembre 2010, disponible en: http://ddd.uab.cat/pub/tesis/2011/hdl_10803_32084/almldel.pdf. Véanse, e.g.: M. Elósegui, Diez temas de género, Madrid, Eds. Internacionales Universitarias, 2002; J. Colapinto, As Nature Made Him: The Boy Who Was Raised as a Girl, New York, Ed. Harper Perennial, 2001; J. Scala, La ideología de género, o el género como herramienta de poder, Madrid, Ed. Sekotia, 2010; P. Martínez y otros, La ideología de género, reflexiones críticas: lucha de clases por lucha de sexos, Madrid, Ed. Ciudadela, 2009; D. O’Leary, La agenda de género: redefiniendo la igualdad, Louisiana, Vital Issues Press, 1997.

 Tesis doctoral de A.C. León Mejía, Una aproximación analítica al feminismo de género, Universidad Autónoma de Barcelona, septiembre 2010, pág. 45, http:// ddd.uab.cat/pub/tesis/2011/hdl_10803_32084/alm1de1.pdf (última visita 4 de febrero de 2013).

 Íd.

 Íd, pág. 47.

 Íd, págs. 46-47. De ahí deriva “que ni la igualdad de los sexos es un requi-sito indispensable para que hombres y mujeres sean valorados y tratados de igual manera, ni las diferencias entre los sexos justifican medidas de discriminación positiva”. íd, pág. 48.

 Íd, pág. 47. Como nota curiosa, la autora señala que el neurocientífico Baron-Cohen tardó más de cinco años en escribir su libro La diferencia esencial (2003) debido a que en los noventa este era un tema muy sensitivo. Igualmente, cuenta que ciertos estudiosos de la neuropsicología y la psicología cognitiva le han comunicado que aun teniendo información sobre estas diferencias, rehúsan partici-par de la discusión por carecer de ganas para lidiar con la corrección política del tema.

 Randazza, D’Amico, Cartabia et al., op. cit., pág. 431. “No obstante, a los ojos de los constitucionalistas hay algo de paradójico en la extensión de esta nueva fron-tera de los derechos individuales según esta ideología, pues se tiende a prescindir del cuerpo para la afirmación de la persona, o quizás a despreciarlo por ser un impedi-mento para la plena afirmación del sujeto. Es paradójico, pues las primeras luces sobre los derechos de la persona se basaron, precisamente en la valoración del cuerpo: habeas corpus, el primer y más difundido de los derechos humanos... Prote-ger al cuerpo humano del poder del Estado ha coincidido con el inicio de un largo recorrido hacia la afirmación de la libertad de la civilización humana”. (Traducción nuestra).

 Íd., pág. 432.

 Íd.

 Íd.

 Íd.

 Disponible en: http://www.adoctrinamientodegenero.org/wp-content/pdf/ ideologiayviolenciadegenero.pdf

 H.C. Andersen, El traje nuevo del emperador, disponible en: http:// www.espacioebook.com/cuentos/andersen/Andersen — ElTrajeNuevodelEmperador.pdf.

 “[A]t this time we need education in the obvious more than investigation on the obscure”. O.W. Holmes, Collected Legal Papers, Nueva York, Ed. Hartcourt Brace, 1920, págs. 292-293.

 C.H. Hart, Ph.D., Combating the Myth that Parent’s Don’t Matter, Remarks to World Congress of Families II, Geneva, Switzerland, 14 de noviembre de 1999, disponible en http://www.worldcongress.org/wcf2 — spkrs/wef2—hart.htm.
Entre algunos datos interesantes que comenta el escrito se encuentran los si-guientes:
“When downplaying the importance of fathers, notably missing from arguments presented in the recent American Psychologist paper is a significant body of research indicating that fathers are more oriented towards being physically playful with their children than mothers (Parke, 1996; Isley, O’Neil, Clatfelter, & Parke, 1999). Fathers eliciting more positive and less negative emotion from children during play has been shown to help children learn to read social cues and regulate their emotions in ways that can result in more positive social adjustment with peers (Carson & Parke, 1996; Parke et al., 1992; 1994). Fathers being patient and understanding of children’s emotions lends itself to similar positive social outcomes (see Parke, 1996). Interestingly, studies have shown stronger links in these regards for fathers than for mothers (see Parke, 1996; Isley, O’Neil & Parke, 1996). Findings from recent research that we conducted in Russia support these conclusions. Greater playfulness, patience, and understanding with children on the part of fathers was associated with less child aggressive behavior with peers at school. Our statistical analyses showed that father effects outweighed mother effects in this regard, again illustrating relatively stronger father influence in the playful domain of parent-child interaction (Hart, Nelson et al., 1998)”.

 El caso de que se permita la adopción por una persona soltera, por lo menos no trata dos realidades diferentes como iguales. Simplemente la ley se limita a con-templar una situación donde no se oculta la carencia de la monoparentalidad. Lacroix, op. cit.

 Homosexual Parenting: Is It Time For Change?, American College of Pediatricians, marzo 2012, disponible en: http://www.acpeds.org/parenting-issues/82-homosexual-parenting-is-it-time-for-change- (última visita 4 de febrero de 2013).
Cabe señalar que un grupo de setenta académicos prominentes en campos per-tinentes y relevantes concluyeron que “[t]he current research on children reared by [same-sex couples] is inconclusive and underdeveloped- — we do not yet have any large, long-term, longitudinal studies that can tell us much about how children are affected by being raised in a same-sex household”. The Witherspoon Inst., Marriage and the Public Good 18 (2008), disponible en: http://www.winst.org/family _marriage_and_democracy/WI_Marriage.pdf. Véanse, además: L.D. Wardle, Considering the Impacts on Children and Society of Lesbigay Parenting, 23 Quinnipiac L. Rev. 541, 550-56 (2004); L.D. Wardle, The Potential Impact of Homosexual Parenting on Children, U. Ill. L. Rev. 833, 897 (1997).

 B. Obama, If I could be anything, I’d be a good father, Parade, 21 de junio de 2009, págs. 4-5.

 H. Arendt, Los orígenes del totalitarismo, Madrid, Ed. Alianza, 2006, pág. 696. Véase H. Arendt, Le origini del totalitarismo, Milano, Ed. di Comunitá, 1996, pág. 649.

 Es meritorio comentar que en el disenso de la Jueza Asociada Señora Ro-dríguez Rodríguez se parece dar por sentado que desde Marbury v. Madison, 5 U.S. *957 137 (1803), los contornos del poder de revisión judicial representan un dogma cons-titucional incuestionable y sin límites de lo razonable. Eso no es cierto. En palabras del profesor Alvarez González, “[u]n vistazo a la literatura sobre el derecho consti-tucional norteamericano revela precisamente lo contrario: las enormes dudas que desde hace casi doscientos años se manifiestan en torno a este tema”. J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2010, pág. 33. Para una discusión profunda y fundamentada sobre este tema, véase L.D. Kramer, The People Themselves: Popular Constitutionalism and Judicial Review, Nueva York, Ed. Oxford Univ. Press, 2004. Estas dudas se disipan en la medida en que el Poder Judicial sea consciente de su rol constitucional y de los límites de su Poder.

 Diccionario de la lengua española, 22da ed., Madrid, Ed Espasa Calpe, 2001, T. II, pág. 1655. Es “conveniente” utilizar el diccionario, y no es para menos, de la Real Academia Española. No vemos razones de peso para realizar una investiga-ción etimológica exhaustiva en pos de comprender lo evidente en el contexto de lo expuesto; esto es, la deconstrucción de todos los significados que afectan nuestra *958 discusión. No hay estelas que, después del “borrón” de estos significados, se puedan salvar.

 Opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, pág. 1052 esc. 44.

 Íd., pág. 1063 esc. 47.

 Esto porque la concepción artificial sí es una construcción (creación) humana.

 B. Obama, Dreams from my Father, Nueva York, Crown Publishers, 2004.
(1) Discurso Inaugural del Presidente Barack Obama, 21 de enero de 2013. http://www.whitehouse.gov/the-press-office/2013/01/21/inaugural-address-president-barack-obama (última visita el 14 de febrero de 2013).